Barbara BRADLEY, et al., Plaintiffs,

v.

SEQUOYAH FUELS CORPORATION,
Defendant.

Randall ALLEN, et al., Plaintiffs,

v.

SEQUOYAH FUELS CORPORATION,
Defendant.

Nos. 93–252–S, 93–514–S.

United States District Court,
E.D. Oklahoma.

March 23, 1994.

William Andrew Edmondson, Mark Green, Don Pearson, Muskogee, OK, for plaintiffs.

James P. McCann, Kathy R. Neal, James R. Polan, Tulsa, OK, for defendant.

## OPINION

SEAY, Chief Judge.

This is a consolidated action brought by plaintiffs against defendant, Sequoyah Fuels Corporation ("SFC"), pursuant to the provisions of the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. §§ 2101–2109. The remaining plaintiffs in Case No. 93–252–S are Barbara Bradley, Linda Box, Stanley Brown, Jimmy Case-

bolt, Phyllis Clay, Edward Elbon, John Fox, Johnny Galatian, Dixie Harl, Randy Maxwell, Arthur Pearson, Coletta Peyton, Janet Ross, Marty Ross, Mike Sutterfield, Sue Smith, Graham Swearingen, Lawrence White, and Jesse Wilkerson. The remaining plaintiffs in Case No. 93–514–S are Randall Allen, Virginia Callison, Deborah A. Emerson, Don M. Goad, D.K. Isham, Rick Jackson, Patricia Linthicum, Donald Lyons, Paul E. Pewitt, Tammy L. Posch, William Shell, Thomas E. Smith, Dwayne Vernon, Jim Weemes, Lee Ann Allen, John W. Davis, and Perry D. Trotter. All plaintiffs were formerly employed by SFC at its commercial uranium conversion plant in Gore, Oklahoma, prior to the closing of the plant on November 30, 1992.[1] Plaintiffs seek to recover backpay and benefits from SFC based on their contention that SFC violated the WARN Act by failing to give them sixty days' advance written notice of the November 30, 1992, plant closing. SFC defends against plaintiffs' claims by asserting that its failure to give the required sixty days' notice was excused under the "business circumstances exception" of the WARN Act.

SFC previously moved the court for the entry of summary judgment in its favor based on its asserted defense of the "business circumstances exception". The court found that there were genuine issues of material fact with respect to SFC's defense and denied the motion. Thereafter, the court ordered the issue of liability bifurcated from the issue of relief. In accordance with the bifurcation order, the liability phase of this action came on for trial before the court on January 20 and 21, 1994. Based on the evidence presented, the court enters its findings and conclusions as required by Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

#### Employment Status of Plaintiffs Posch and Lyons

Posch began her employment at SFC in September 1992, as a warehouse clerk. Her

hiring was on a temporary basis and she was not afforded the work-related benefits provided to full-time employees. In the latter part of October 1992, Posch was required by SFC to transfer to a temporary employment agency, Allied Staffing Associates ("ASA"). Posch's work activities and pay remained the same; however, from the latter part of October 1992, until her termination on November 30, 1992, Posch was officially employed by ASA and was paid by ASA.

Lyons began working at SFC on June 8, 1981, as a chemical operator and worked until April 1992, when he went on medical leave as a result of an on-the-job back injury. Lyons has been receiving worker's compensation payments since April 1992, and he has approximately seventy to eighty weeks of payments remaining. At the time of his termination on December 9, 1992, and continuing up until the time of trial, Lyons had not been released to return to work by his doctors. Lyons testified that he is not sure if he will ever be physically capable of returning to work.

#### The October 1991 Shutdown

The Gore, Oklahoma, facility operated by SFC is a nuclear chemical processing facility which has as its primary process the purification and conversion of natural uranium concentrates into uranium hexafluoride ($UF_6$) for use by nuclear power companies. The other process at the facility involves a chemical reduction of depleted $UF_6$ into $DUF_4$, a green powder that can be smelted into uranium metal. SFC is licensed to operate the Gore facility through the Nuclear Regulatory Commission's ("NRC") issuance of operating and bi-product licenses. The NRC's regulation and oversight of SFC's operations over the past decade can best be described as pervasive and extensive. As the testimony at the trial established, SFC's performance history has resulted in the existence of an adversarial relationship between SFC and the NRC with respect to the continued operation of the Gore facility.

---

**1.** SFC concedes that all plaintiffs are "affected employees" for purposes of the WARN Act with the exception of Tammy L. Posch, who is claimed to have been an employee of Alliance

Staffing Associates and working on a contract basis for SFC, and Donald Lyons, an injured employee on medical leave.

In September 1991, the Gore facility was shut down for routine maintenance. During the course of this shutdown, various safety issues were triggered when soil contamination was discovered in connection with the excavation of a tank. As a result, the NRC ordered the facility not to return to service. The NRC's investigation uncovered significant operational deficiencies at the Gore facility and it imposed a shutdown in October 1991 that lasted until April 1992, at which time a phased start-up of the facility began. During the NRC ordered shutdown, SFC employees were required to undergo extensive training with respect to operational procedures in order to achieve a safer and more controlled working environment. NRC inspectors were a constant presence at the Gore facility during this time. They engaged in an unprecedented around-the-clock monitoring and oversight of SFC's activities.

No employees were laid off during this period even though no revenues were being generated from production. The employees were involved in maintenance activities as well as activities in connection with the revision of procedures to meet general NRC standards and specific standards set by the NRC related to the start-up. During the shutdown, SFC also made changes in its senior management, including its President and Vice–President. For the nine-month period between October 1991 and April 1992, SFC lost approximately $18 million in revenue. This loss reduced SFC's net worth by one-third and put SFC in a very unstable financial situation. SFC lost its operating line of credit with Citibank. In order to meet its financial obligations, SFC received advances from its parent company, General Atomics.

The various phases of the start-up were completed without major incident and by June 1992, SFC had increased its production of $UF_6$.[2] In September 1992, the NRC closed out its October 1991 shutdown order. This action by the NRC was an acknowledgement that SFC had taken the necessary corrective action to satisfy the requirements imposed on them under the NRC's shutdown order. Essentially, the NRC gave SFC a "clean bill of health" for continuation of operations.

*The November 17, 1992, Release of Nitrogen Dioxide*

Shortly after SFC was released from the shackles of the October 1991 NRC order, an event occurred in the $UF_6$ area which caused the NRC to order the immediate shutdown of the entire Gore facility. On November 17, 1992, a sudden and unexpected reaction in a digester resulted in the release of a plume of nitrogen dioxide, a hazardous, toxic and potentially lethal gas. The gas escaped the facility and formed a brown cloud that was being carried by a strong wind. Because the release was likely to affect the public, SFC declared a site area emergency, the second highest emergency level. Following the release, SFC immediately telephoned the NRC and notified them of the release. Pursuant to his telephone conversation with the NRC regional administrator, then SFC Senior Vice–President, John Ellis, orally agreed to shut down the plant and not restart operations until 1) SFC completed an investigation of the circumstances and causes of the release and 2) SFC briefed the NRC on the findings of the investigation and obtained the NRC's concurrence on the restart of the processes. SFC had no choice but to agree to the shutdown because if they had not so agreed, the NRC would have issued an order to the same effect. This agreement was reduced to writing in the form of a Confirmatory Action Letter which was issued by the NRC on November 18, 1992. This Confirmatory Action Letter had the same force and effect as an order issued by the NRC and it mandated the shutdown of the facility for an indefinite period of time.

Based on the severity of the release and the previous dealings between SFC and the NRC, including the nine-month shutdown in connection with the October 1991 incident,

---

**2.** SFC did experience some minor incidents, the worst being a June 1992 leak of a few grams of $UF_6$ in the $DUF_4$ production area. This incident resulted in a fine being imposed by the NRC for violation of personnel action and the temporary shutdown of the $DUF_4$ operation. This incident, however, was not considered a major event and it did not seriously impact the NRC's oversight decisions.

there was a substantial basis for SFC's belief that this latest shutdown would last, at a minimum, nine months. A shutdown for this duration and the attendant loss of revenue would mean that SFC would not be able to continue its operations at the Gore facility without advancement of funds from General Atomics or from some other source.

In its root cause analysis of the November 17, 1992, incident, SFC determined that operator error was the root cause of the incident.[3] Specifically, SFC concluded that the operator failed to visually ensure that the slide gate valve for the digester was closed. As a result, the valve was not shut and the operator inadvertently transferred uranium concentrate to the digester. This uranium concentrate was combined in an uncontrolled fashion with the nitric acid present in the digester and caused a violent exothermic chemical reaction which released large quantities of nitrogen dioxide. The NRC's root cause analysis prepared by NRC's Augmented Inspection Team differed from SFC's analysis. In its root cause analysis, the NRC determined the root cause to be the inoperable valve combined with the inadvertent operation of the feed transfer conveyor in the opposite direction.[4]

*Converdyn Partnership*

In June 1992, SFC was approached by Allied–Signal Energy Services, Inc. (ASI) about the formation of Converdyn, a joint venture partnership between the parties with its primary purpose being the marketing and sale of $UF_6$ on a worldwide basis. Under this proposed agreement, all $UF_6$ production would be completed at ASI's Metropolis, Illinois, facility and SFC's facility at Gore would be "mothballed" with the exception of $DUF_4$ production which would remain at the Gore facility under NRC license. SFC was to be paid certain fees for being placed on a stand-by mode with eventual decommissioning of the $UF_6$ operations. SFC would relinquish its existing contracts and the Converdyn partnership would provide the $UF_6$ production to service those contracts through ASI's Metropolis, Illinois, facility.

There were extensive communications and negotiations between SFC and ASI over the next few months. The negotiations were closely guarded and were kept confidential. The proposed agreement involved complex financial, operational, legal, and regulatory issues. These issues, as well as other business considerations, rendered the prospects for consummation of the agreement somewhat tenuous. Additionally, the November 17, 1992, release of nitrogen dioxide at the Gore facility further dimmed the prospects for an agreement as SFC officials believed ASI might be less interested in entering into a partnership agreement if the Gore facility was to be shut down for an extended period of time. SFC reasoned that the shutdown of the Gore facility would make it impossible for SFC to meet its contractual obligations and ASI, SFC's competitor in the $UF_6$ production market, would most likely be able to step in and satisfy SFC's outstanding contractual obligations without the necessity of entering into a partnership agreement with SFC which would obligate ASI to reimburse SFC for certain decommissioning costs. In the end, however, the November 17, 1992, release did not persuade ASI to forego the partnership relationship with SFC and, on November 23, 1992, the Converdyn partnership agreement was signed and executed by SFC and ASI.[5]

*The November 30, 1992, Plant Closing*

Following the November 17, 1992, release of nitrogen dioxide, management officials and members of the boards of directors of SFC

---

3. Contributing causes, as found by SFC, were 1) the gate valve did not operate properly, 2) powder was introduced into the digester unknowingly, 3) marginal performance of the nitrogen oxide emission control ($NO_x$) system, 4) the digester vent to the $NO_x$ system closed while adding acid to the digester, 5) no procedural requirements to ensure that the digester is empty before the addition of acid, and 6) controls for the digester could not identify which digester was the source of the nitrogen dioxide.

4. Contributing causes, as found by the NRC, were inadequacies in procedures, maintenance and surveillance, training, human factors, and management control.

5. The actual parties to the agreement are ASI and General Atomics Energy Services, Inc., SFC's parent company.

and General Atomics met in San Diego, California, on November 21, 1992, to discuss the ramifications of the NRC imposed shutdown of the Gore facility and the ongoing negotiations with ASI regarding the potential formation of the Converdyn partnership. The consensus reached at this meeting was that SFC would be under an extended shutdown of its Gore facility during which time no revenues would be generated; consequently, the Gore facility could not continue operations without additional advances from General Atomics. It was further believed to be entirely possible that the Gore facility would never return to full operation given the fact that the NRC had only recently "turned them loose" from the October 1991 extended shutdown. Based on the likelihood of an extended shutdown, the inability of SFC to generate any revenue during such period, and a possible total cessation of operations, the decision to not advance any additional funds to SFC was made by General Atomics. Faced with the loss of any revenue and the lack of any financing, SFC decided not to restart the $UF_6$ operations, to place the $UF_6$ plant in a standby configuration, and to immediately release employees. On November 23, 1992, SFC notified its employees of these decisions. On November 25, 1992, SFC sent each terminated employee a letter setting forth November 30, 1992, as the effective date of termination.[6]

### Conclusions of Law

The WARN Act requires that certain employers give affected employees, state dislocated worker units, and local units of government at least sixty days' notice before any plant closing or mass layoff. 29 U.S.C.

**6.** It is stipulated that one hundred seven employees were terminated on November 30, 1992.

**7.** 29 U.S.C. 2102(a) provides in pertinent part:

(a) Notice to employees, state dislocated worker units and local governments
An employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order—
(1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee;

**8.** A "plant closing" means

§ 2102(a)(1). The purpose of the WARN Act is to

provide[ ] protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. Advance notice provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market.

20 C.F.R. § 639.1(a). It is important for courts to keep this purpose in mind when interpreting the various provisions of the WARN Act. "WARN is a remedial statute and must be construed broadly." *Solberg v. Inline Corp.*, 740 F.Supp. 680, 685 (D.Minn. 1990), *citing Belland v. Pension Benefit Guar. Corp.*, 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984).

■ As a preliminary matter, the court finds that there is no dispute as to the existence of several of the essential elements of a cognizable WARN Act claim. First, the WARN Act requires a "plant closing" or "mass layoff" to trigger its notice provisions. 29 U.S.C. § 2102(a).[7] The November 30, 1992, shutdown of all uranium processing operations at SFC's $UF_6$ unit and the termination of one hundred seven employees constitutes a "plant closing".[8]

Second, SFC must qualify as an "employer" for purposes of the WARN Act. 29 U.S.C. § 2101(a)(1).[9] SFC admits that it is an "employer" as it employed more than one hundred employees.

the permanent or temporary shutdown of a *single site of employment,* or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30–day period for 50 or more employees excluding part-time employees
29 U.S.C. § 2101(a)(2).

**9.** An "employer" means

any business enterprise that employs—
(A) 100 or more employees, excluding part-time employees; or
(B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)

██ Finally, plaintiffs must be "affected employees". 29 U.S.C. § 2101(a)(5).[10] With the exception of Posch and Lyons, SFC concedes that plaintiffs are "affected employees" as they experienced an employment loss in the form of their respective terminations of employment with SFC as of November 30, 1992.[11] The court finds that neither Posch nor Lyons are "affected employees" under the WARN Act. From October 1, 1992, Posch was employed by ASA working at SFC's Gore facility pursuant to a transfer of services agreement between SFC and ASA. Posch was paid by ASA and understood that her employment was on a temporary basis with ASA. Essentially, Posch was a contract employee working at the Gore facility. The Department of Labor's regulations implementing the provisions of the WARN Act provide that neither consultants nor contract employees are considered "affected employees":

> Consultant or contract employees who have a separate employment relationship with another employer and are paid by that employer, or who are self-employed, are not "affected employees" of the business to which they are assigned.

20 C.F.R. § 639.3(e). Because Posch was employed and paid by ASA, she is not an "affected employee" entitled to seek relief under the provisions of the WARN Act. As to Lyons, the court likewise finds that he is not an "affected employee" because he is not an individual "who may reasonably be expected to experience an employment loss" as a result of the plant closing. 29 U.S.C. § 2101(a)(5). The interpretive regulations in this area provide some guidance:

**10.** The term "affected employees" means

employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer.
The term "employment loss" includes an employment termination, other than a discharge for cause, voluntary departure, or retirement. 29 U.S.C. § 2101(a)(5)(6)(A).

**11.** In its trial brief and proposed findings of fact and conclusions of law, SFC also argues that the plaintiffs in 93–514–S are not entitled to any relief because their lawsuit was not filed within the applicable statute of limitations period. Be-

Workers on temporary layoff or on *leave* who have a reasonable expectation of recall are counted as employees. An employee has a "reasonable expectation of recall" when he/she understands, through notification or through industry practice, that his/her employment with the employer has been temporarily interrupted and that he/she will be recalled to the same or to a similar job.

20 C.F.R. § 639.3(a)(ii) (emphasis added); *see also Damron v. Rob Fork Mining Corp.*, 945 F.2d 121, 124–25 (6th Cir.1991) (in analyzing "temporary layoff" and "reasonable expectation of recall" under 20 C.F.R. § 639.-3(a)(ii), the court addressed five factors used by the NLRB in such situations: 1) past experience of the employer, 2) employer's future plans, 3) circumstances of the layoff, 4) expected length of layoff, and 5) industry practice). In April 1992, Lyons went on medical leave as a result of a back injury. He is still receiving worker's compensation payments and has approximately seventy to eighty weeks of payments remaining. He last received a paycheck from SFC in May 1992. He is still under the care of a doctor and has not been released to return to work. Lyons has not presented anything to convince the court that he has the present capacity to return to work, or that in the near future he will attain such capacity. Under these circumstances, the court concludes it is highly unlikely that Lyons will ever return to work; consequently, he has failed to establish that he had, or has, a "reasonable expectation of recall" sufficient to qualify him as an "affected employee" under the WARN Act. *See Kildea v. Electro Wire Products, Inc.*, 792 F.Supp. 1046, 1050 (E.D.Mich.1992)

cause the WARN Act does not contain a limitations period, SFC argues that the most closely analogous period is the six-month limitation period applicable to the National Labor Relations Act, 29 U.S.C. § 160(b). The plaintiffs counter by arguing for the application of the most closely analogous state statute of limitations, Oklahoma's three-year limitation period for actions upon a liability created by statute, 12 O.S. § 95. Because no pretrial determination on this issue was requested, this case proceeded to trial on the merits of all plaintiffs' claims, and the court holds against all plaintiffs on the merits, the court finds it unnecessary to address the limitation issue.

(former employees have the burden of proving they had a reasonable expectation of recall so as to be considered "affected employees" under the WARN Act).

█ Notwithstanding the remaining plaintiffs' satisfaction of the fundamental elements of a WARN Act claim, SFC contends that it is not liable to these plaintiffs because the November 30, 1992, plant closing was caused by circumstances not reasonably foreseeable as of October 1, 1992, the date notice would have been required under the sixty-day requirement of 29 U.S.C. § 2102(a). The WARN Act does contain certain exceptions to the notice requirement. 29 U.S.C. § 2102(b). One of those exceptions, commonly referred to as the "business circumstances exception", provides:

[a]n employer may order a plant closing or mass layoff before the conclusion of the 60–day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.

29 U.S.C. § 2102(b)(2)(A). SFC relies on this "business circumstances exception" and argues that the November 17, 1992, release of nitrogen dioxide was a sudden and unexpected event which caused the plant closing. Consequently, SFC claims it was relieved from the sixty-day notice requirement and that the notice it sent to all employees on November 23, 1992, fulfills its obligations under the WARN Act and relieves it from any liability to plaintiffs.[12]

In considering whether the "business circumstances exception" applies to a particular set of facts, the court must first determine if the plant closing or mass layoff was caused by the asserted business circumstance. *Jurcev v. Central Community Hosp.,* 7 F.3d 618, 623–25 (7th Cir.1993); *Jones v. Kayser–Roth Hosiery, Inc.,* 748 F.Supp. 1276, 1285–88 (E.D.Tenn.1990). If causation is established, the court must then determine if the business circumstance was not reasonably foreseeable at the time the sixty-day notice would have been required. In this regard, "[a]n important indicator of a business circumstance that

is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1). The court must evaluate the employer's actions and decisions by focusing on the employer's business judgment.

The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services. 20 C.F.R. § 639.9(b)(2).

The court finds that the evidence conclusively establishes the November 17, 1992, release of nitrogen dioxide as a sudden and unforeseeable event which acted as the triggering mechanism for several other events, each of which were also sudden and unforeseeable. These events—the NRC mandated shutdown for an indefinite period of time, the inability of SFC to generate revenue during this period, and the refusal of General Atomics to provide additional advance funds— *caused* SFC to make the commercially reasonable business decision on November 21, 1992, to discontinue the $UF_6$ operations. As to *foreseeability,* the court finds that there is no persuasive evidence establishing that SFC was aware, or should have been aware, of the likelihood of this chain of events. Even assuming that there was some degree of negligence on the part of SFC supervisors and management with respect to the maintenance and operation of the slide gate valve, any negligence in this respect would not make it reasonably foreseeable that a major off-site release of nitrogen dioxide would occur.

The situation in this case is not unlike that present in *Jurcev.* In *Jurcev,* the defendant hospital voted on February 26, 1990, to close its operations when the Central Community Foundation ("Foundation"), a not-for-profit

---

**12.** An employer relying on the "business circumstance exception" must give as much notice as practicable and give a brief statement of the basis for reducing the notification period. 29 U.S.C. § 2102(b)(3).

corporation that managed the hospital's financial affairs, voted to cease making any more subventions to the hospital. The Foundation made the decision to cease subventions because prior subventions had invaded the principal of the endowment fund and the legal and tax advice it received indicated that it would lose its tax-exempt status because of this invasion of the principal. Because the hospital was to be closed effective March 14, 1990, a class of employees filed suit under the WARN Act claiming violation of the sixty-day notice provision. As to causation, the Sixth Circuit upheld the district court's determination that the decision to cease making subventions caused the hospital to close on March 14, 1990; that the hospital did not control the Foundation and could not compel subventions; and that the WARN Act did require the hospital to demonstrate that it had insufficient assets to remain open for sixty days after the Foundation decided to cease making subventions. *Id.* at 625. As to foreseeability, the Sixth Circuit agreed with the district court's conclusions that the Foundation's decision to cease making subventions was unforeseeable on January 14, 1990 (sixty days prior to the closing); that the Foundation's decision was sudden, dramatic, and unexpected because no one had reason to know until February 1990 that there was an invasion of the principal which might jeopardize the Foundation's tax-exempt status; and that no one knew or should have known until February 26, 1990, that the Foundation would cease making subventions. *Id.* at 627. Consequently, the Sixth Circuit affirmed the district court's entry of summary judgment in favor of the hospital and the Foundation.

Like the hospital in *Jurcev,* SFC was confronted with a sudden and dramatic event which caused a shutdown. SFC's operating capital was completely exhausted as a result of the November 17, 1992, release of nitrogen dioxide and the simultaneous NRC mandated shutdown. SFC had no source of funds to operate as of November 17, 1992. Notwithstanding the fact that General Atomics was SFC's parent company, there is no evidence indicating that SFC had any control over the financial decisions of General Atomics. Thus, SFC and General Atomics are to be treated as separate and independent companies and General Atomics' decision to cease making additional advances cannot be attributable to SFC. *See* 20 C.F.R. § 639.3(2) (relevant factors in determining whether parent company and wholly owned subsidiary are separate are 1) common ownership, 2) common directors and/or officers, 3) de facto exercise of control, 4) unity of personnel policies emanating from a common source, and 5) the dependency of operations); *Jurcev,* 7 F.3d at 624 (hospital did not control Foundation's decisions on whether to continue making subventions). With respect to foreseeability, just as the Foundation's decision to cease making subventions in *Jurcev* was unforeseeable because of its sudden and dramatic nature, so was the November 17, 1992, release of nitrogen dioxide which came less than one month after the NRC had closed out a previous shutdown order and given SFC a "clean bill of health" regarding continued operations. Given the magnitude of the release and the ramifications which followed from it, the court can only conclude that the November 17, 1992, release, and its effects, were clearly within the contemplated statutory definition of an "unforeseeable business circumstance".[13]

Under the circumstances presented herein, it is readily apparent that SFC exercised sound business judgment with respect to both the cessation of $UF_6$ operations and the failure to provide the required WARN Act notice. The court finds the "business circumstances exception" relieves SFC from

---

**13.** At trial, plaintiffs spent a significant amount of time developing a factual record to support their position that SFC had contemplated the plant closing in connection with the Converdyn partnership as early as June 1992 and that it used the November 17, 1992, release as an excuse to avoid the WARN Act requirements. The court rejects this argument for the following reasons: 1) there is no evidence of any attempt by SFC to avoid or manufacture any exception to the WARN Act requirements during the negotiations involving the Converdyn partnership, 2) the consummation of the Converdyn partnership was tenuous, 3) the Converdyn partnership was ultimately executed after the November 17, 1992, event, and 4) SFC's conclusion that the "unforeseeable business circumstance" exception was applicable was formed after a thorough review, by legal counsel, of the WARN Act and the implementing regulations.

any liability to plaintiffs under the WARN Act.[14]

### CONCLUSION

Based on the foregoing reasons, the court finds the issues in favor of SFC and against plaintiffs on the WARN Act claims presented. Consequently, judgment in favor of SFC shall be entered simultaneously herein.

**IT IS SO ORDERED**

### JUDGMENT

Pursuant to the court's Findings of Fact and Conclusions of Law entered simultaneously herein, the court finds the issues in favor of defendant and against plaintiffs and judgment is entered in favor of defendant on plaintiffs' claims brought pursuant to the WARN Act, 29 U.S.C. § 2101–2109.

---

**14.** Once the decision was made to shut down the $UF_6$ operations, SFC complied with the reduced notification requirements of 29 U.S.C. § 2102(b)(3) by promptly notifying the "affected employees" regarding their effective termination date of November 30, 1992.