Stephanie A. STRASS, Appellant,

v.

KAISER FOUNDATION HEALTH PLAN OF MID–ATLANTIC, Appellee.

No. 96–CV–1122.

District of Columbia Court of Appeals.

Argued March 24, 1998.
Decided Jan. 20, 2000.

James H. Heller, with whom Tracy L. Hilmer, Washington, DC, was on the brief, for appellant.

Paul C. Skelly, with whom Weatherly Lowe Bentley, Washington, DC, was on the brief, for appellee.

Before WAGNER, Chief Judge, and SCHWELB and REID, Associate Judges.

WAGNER, Chief Judge.

This case involves claims of breach of contract and wrongful termination of employment under the District of Columbia Human Rights Act, D.C.Code § 1–2512(a)(1) (1992) (Human Rights Act or the Act), which prohibits an employer from discharging an employee for discriminatory reasons, including physical handicap. After being terminated from her employment, appellant, Stephanie Strass, sued her former employer, Kaiser Foundation Health Plan of the Mid–Atlantic States, Inc. (Kaiser), alleging that her employment had been terminated because of her physical handicap, hypertension, in violation of the Human Rights Act and contract of employment. A jury returned a verdict in favor of Strass in the total amount of $525,047.00. The trial court set aside the verdict and granted judgment as a matter of law to Kaiser on both the breach of contract claim and violation of the Human Rights Act. The trial court concluded that Strass failed to prove that her physical condition could be accommodated reasonably. On the breach of contract claim, the court concluded that the evidence was insufficient to permit a jury to conclude that there was an express or implied agreement between Kaiser and Strass. Strass argues on appeal that the evidence and the law support the jury's verdict on both her theories of liability. We agree and reverse and remand for further proceedings consistent with this opinion.

## I. *Factual Background*

In April 1988, Kaiser hired Strass as its Director of Public Affairs. Her job re-

sponsibilities included various public relations functions, such as writing publications for members, community relations, media relations, and special events. In addition, Strass was responsible for handling questions arising in the course of Kaiser's dealings with the public. At the beginning of her employment with Kaiser, in addition to Strass, her department had two public affairs representatives, a secretary and one on-call person who worked one day per week. By the late fall of 1990, Strass' department had decreased by two, leaving the Public Relations Department with only one other full-time professional in the Washington office.[1]

In the late summer of 1991, Strass began experiencing headaches, fatigue, an inability to relax, and insomnia. Strass attributed her symptoms to pressures associated with working with a short staff and preparation for Kaiser's annual board of directors' meeting scheduled to be held in November 1991. On August 15, 1991, Strass reported her symptoms to Dr. Seonae Pak. After several visits in which Strass' blood pressure readings were elevated, Dr. Pak diagnosed Strass as having hypertension, which he attributed to her work situation.[2]

Dr. Maron testified that Strass' blood pressure was normal from 1977 to August 1991. However, from August 1991 until February 1992, "[a] period of time in which [Strass] was surrounded by employment stresses," Strass' blood pressure was abnormal. Dr. Maron further testified that Strass' abnormal blood pressure reading continued about 46% of the time, through June 1994, two years after Strass' termination from Kaiser. Dr. Maron testified that Strass' hypertension was caused by "an unusual and extraordinary stressful situation related to her employment at

---

1. One individual terminated employment with Kaiser, and the other was discharged.

2. At trial, Dr. Barry Maron, Strass' medical expert, defined hypertension as high blood

pressure which means readings of at least 140 systolic or 90 diastolic on more than one occasion within a close period of time.

Kaiser." He also testified that, to a reasonable degree of medical certainty, if the particular stress situation had been eliminated, her blood pressure would have returned to normal. He also testified that removal of the stress and addressing the condition without medication was the preferable course of action.

In early October 1991, Strass informed her supervisor, Robin Thomashauer, that she had been diagnosed with hypertension and that the stress of preparing for the board meeting with inadequate staff was making her ill. Thomashauer said that Strass' condition and the job situation was not "a good fit." About a week later, Strass went to see Rick Snocker, Kaiser's manager of human resources, seeking a solution to the situation. Snocker suggested during this meeting that Strass' medical condition might qualify for reasonable accommodation. Strass then visited Gary Fernandez, Thomashauer's boss, seeking reasonable accommodation for her illness. Strass suggested restructuring her job, filling the staff vacancies in her office, or transferring her to another position within the organization.

In January 1992, Strass expressed an interest to Thomashauer in a newly created position of Director of Community Relations. In spite of Strass' background in community relations, she was not offered the position. At trial, Thomashauer testified that the position was not given to Strass because it was believed that Strass' bitterness towards the company would inhibit her from effectively representing Kaiser in the community.

In early February 1992, Strass met with Thomashauer and Snocker, and they asked her to consider the Compass Career Reappraisal Program, a program designed to assess the suitability of an employee for his or her current job or another position within Kaiser. On February 18, 1992, Strass conditionally declined the offer for enrollment in the program, stating in writing the following reasons for her decision:

> In view of the fact that Kaiser Permanente will not assure me: (1) that my right to privacy will be protected; (2) that the information obtained will be treated as confidential; (3) that the information obtained will not be used to my detriment, I decline to enroll in the Compass Career Reappraisal Program unless my enrollment is required as a condition to remaining employed at Kaiser Permanente.

That same day, Thomashauer gave Strass a memorandum terminating her employment with Kaiser.[3] A memo dated the same date was placed in Strass' personnel file indicating that her negative attitude was a factor in her inability to carry out her job responsibilities effectively.

At the time of Strass' termination, Kaiser had a progressive discipline policy in effect. This policy, Section 8.03 of the Personnel Policy Manual, provided for specific steps to be followed prior to termination of employment with Kaiser. There was a disclaimer in the introduction of the Personnel Policy Manual indicating that it was not a contract. However, other language in the document used mandatory terms in setting forth various conditions of employment, including, *e.g.*, vacation, severance pay, health and safety conditions. There was also a declaration that the manual was Kaiser's statement of intention in matters covered by the policy.

## II. *Analysis*

### A. *Standard of Review*

"A judgment notwithstanding the verdict is proper only in extreme cases,

---

3. The memo read as follows:

 Based on your decision regarding the [C]areer [R]eappraisal [P]rogram and our prior discussions concerning other available opportunity within the organization, I find it necessary to terminate your employment. In light of your tenure with Kaiser Perma-

 nente, we will offer you full out placement services as well as two months' severance pay. Your health insurance will continue through the end of the month in which the second month you pay in. In addition, you're entitled to your full vacation balance.

where 'no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party.'" *Lyons v. Barrazotto,* 667 A.2d 314, 320 (D.C.1995) (quoting *Oxendine v. Merrell Dow Pharm., Inc.,* 506 A.2d 1100, 1103 (D.C.1986), *cert. denied,* 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990) (citations omitted)). If there is some evidence from which the jury could find for a party on the required elements of the claim, or where the resolution of the case requires the resolution of factual issues or a determination of the credibility of witnesses, the case should be submitted to the jury. *Id.* at 320 (citing *Washington Welfare Ass'n, Inc. v. Poindexter,* 479 A.2d 313, 315 (D.C.1984)) (other citation omitted). Where the trial court grants a post-verdict motion for judgment as a matter of law, this court applies the same standard of review on appeal. *Id.* (citation omitted).

**B.** *Claim Under the Human Rights Act*

In setting aside the verdict for Strass, the trial court concluded that the evidence was insufficient to allow a reasonable juror to conclude that Kaiser unlawfully terminated Strass in violation of the Human Rights Act. Specifically, the trial court determined that no reasonable juror could conclude on the evidence presented that Strass was a handicapped person within the meaning of the Act because she had failed to establish that a reasonable accommodation could be made for her claimed

disability. Strass argues that the trial court erred in vacating the jury's finding that Kaiser failed to accommodate her physical handicap in violation of the Human Rights Act.

■ The Human Rights Act "prohibits an employer from discharging an employee based wholly or partially upon discriminatory reasons, including physical handicap." D.C.Code § 1–2512(a)(1)[4]; *American Univ. v. Commission on Human Rights,* 598 A.2d 416, 421 (D.C.1991) (citing D.C.Code § 1–2512(a)(1) (1987)). To establish a *prima facie* case of discrimination based upon handicap, a claimant is required to prove that

"(a) except for his [or her] physical handicap, he [or she] is qualified to fill the position; (b) he [or she] has a handicap that prevents him from meeting the physical criteria for employment; and (c) the challenged physical standards have a disproportionate impact on persons having the same handicap from which he [or she] suffers. To sustain this prima facie case, there should also be a facial showing or at least plausible reasons to believe that the handicap can be accommodated or that the physical criteria are not 'job related.'"

*American Univ.,* 598 A.2d at 422 (quoting *Prewitt v. United States Postal Serv.,* 662 F.2d 292, 309–10 (5th Cir.1981)). Special interrogatories were submitted to the jury in this case covering each of the foregoing elements.[5] The jury found for Strass on

4. D.C.Code § 1–2512(a)(1) reads as follows:
 It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, or political affiliation of any individual:
 (1) To fail or refuse to hire, or to discharge, any individual; or otherwise discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segre-

gate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee[.]

5. The jury was asked to determine: (1) whether "Strass demonstrate[d] that she had a physical handicap that prevented her from meeting the physical criteria of her job"; (2) whether "she was qualified to fill her job at Kaiser except for her physical handicap"; (3) whether she showed "that the physical requirements of the job ... had a disproportionate impact on other people with her same physical handicap"; (4) whether "her handi-

each of these issues. In addition, the jury found specifically that Strass had proved "that Kaiser intentionally discriminated against her, in whole or in part, on the basis of her physical handicap."

At the time relevant to this case, the Act defined a physical handicap as "a bodily or mental disablement which may be the result of injury, illness or congenital condition for which reasonable accommodation can be made."[6] D.C.Code § 1–2502(23). Thus, under this statutory definition, Strass had to prove that her claimed disability, hypertension, was a condition for which reasonable accommodation could be made. *Id.; American Univ., supra,* 598 A.2d at 422. The trial court's decision setting aside the jury's verdict on the claim under the Human Rights Act rested upon its conclusion that Strass had failed to prove there was any reasonable accommodation which Kaiser could have provided that would have enabled Strass to perform the essential functions of her job. While recognizing that usually, the question of reasonableness of accommodation is a question of fact for the jury, the trial court determined that the undisputed facts showed that the accommodations requested were unreasonable as a matter of law. Since this argument forms the basis of the trial court's ruling, we address it first.

Strass proposed two ways for Kaiser to accommodate her condition: (1) restore staff in her department to a full complement of four full-time public affairs representatives; or (2) transfer her to a newly created position of Director of Community Affairs. She contends that the first requested accommodation would have restored the staffing in her department to the level which existed when she handled the position without experiencing hypertension. She contends that the alternative request, a transfer, would have placed her in a position of performing some of the duties required in her public affairs position, but with fewer demands. Thus, Strass argues that the trial court erred in concluding that reasonable accommodation could not be made because it failed to view the facts and reasonable inferences in her favor and accepted Kaiser's evidentiary assessment that Strass' recommended accommodations were merely "speculative."

Assuming first, for the sake of argument, that the accommodations requested would have controlled or eliminated her hypertension, Strass had to show that the accommodations were reasonable. Kaiser argues that Strass' proposed accommodations were not required by law, and the trial court agreed. Specifically, Kaiser contends that an employer is not required to accommodate a handicapped employee by reassigning her to a different position. In support of this argument, Kaiser relies upon the decisions in *Guillot v. Garrett,* 970 F.2d 1320 (4th Cir.1992), *Chiari v. City of League City,* 920 F.2d 311 (5th Cir.1991), and *Carter v. Tisch,* 822 F.2d 465 (4th Cir.1987). Neither *Chiari* or *Carter* support Kaiser's position. In *Chiari,* at issue was whether reasonable accommodation under the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), required an employee to create a new job for the handicapped individual.[7] In *Carter,* the employee sought as an accommodation a light duty assignment. 822 F.2d at 467. In that case, the court concluded that an alternative assignment was not required "unless the employer normally provides such alternative employment under its existing policies." *Id.* Here, Strass did not

---

cap could have been reasonably accommodated"; and (5) whether "Kaiser intentionally discriminated against her, in whole or in part, on the basis of her physical handicap."

6. This section was repealed in 1994, but was applicable at the time Strass filed her complaint.

7. "Section 504 of the Rehabilitation Act of 1973 prohibits discrimination against otherwise qualified handicapped individuals in programs and activities that receive federal financial assistance" and applicable federal regulations. *Chiari, supra,* 920 F.2d at 315, 318.

request the company to create a new position, but only that it assign her to a job reasonably available. *See School Bd. of Nassau County v. Arline,* 480 U.S. 273, 289 n. 19, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Although dicta, the Supreme Court stated the rule on this issue in *Arline* as follows:

> Employers have an affirmative obligation to make a reasonable accommodation for a handicapped employee. Although they are not required to find another job for an employee who is not qualified for the job he or she was doing, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies.

*Id.* (citing 45 C.F.R. § 84.12). This passage tends to support Strass' claim that she should have been considered for another position available in the organization.

■ In *Guillot,* the third case relied upon by Kaiser, the 4th Circuit declined to read the passage from *Arline* as imposing upon the employer an obligation to assign to another position, an employee who was no longer qualified to hold his current position, with or without accommodation. *Guillot, supra,* 970 F.2d at 1326–27. The employee in *Guillot* had lost a top security clearance after it was learned that he failed to disclose his drug and alcohol dependency. Therefore, the employee was no longer eligible for the position he had held. The court held in *Guillot* that reasonable accommodation does not require an employer "to transfer or reassign an employee who is not otherwise qualified for the position he then holds." *Id.* at 1327. The court did observe, however, that neither "under the Rehabilitation or Civil Rights Acts, may a government agency or department deny the handicapped employee—because of his handicap—opportunities that are available under existing statutes or regulations." *Id.* The primary purpose of the District's Human Rights Act is to eliminate all employment discrimination. *See Daka, Inc. v. Breiner,*

711 A.2d 86, 94 (D.C.1998) (citing *Estate of Underwood v. National Credit Union Admin.,* 665 A.2d 621, 637 (D.C.1995)) (referencing the legislative history of the Human Rights Act). It would further that objective to interpret reasonable accommodation to include, as the Supreme Court articulated in *Arline, supra,* that the employer "cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies." 480 U.S. at 289 n. 19, 107 S.Ct. 1123.

■ Under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.* (1995), the definition of reasonable accommodation includes "job restructuring" and "reassignment to a vacant position." *Beck v. University of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996) (citing 42 U.S.C. § 12111(9)); *see also Johnston v. Morrison, Inc.,* 849 F.Supp. 777, 779 (N.D.Ala.1994). Kaiser points out correctly that this law did not become effective until July 26, 1992, after Strass' discharge. *See Morrison v. Carleton Woolen Mills, Inc.,* 108 F.3d 429, 443 (1st Cir.1997). The ADA is not retroactive. *Id.* Kaiser contends, therefore, that this court cannot look to the terms of the ADA or cases decided under it for guidance, unless consistent with prior Rehabilitation Act law. To address this issue, we need not resolve whether this court can look to subsequent enactments and cases based thereon as guidance for the meanings of words in our own preexisting statute. For, not only is there nothing in the Human Rights Act which would preclude an interpretation of reasonable accommodation in our statute to include the requirement that the employer not deny reasonable alternative and available employment for which the employee is qualified, but that meaning may be inferred within the context of the Act, particularly given its broad purposes. *See Arline, supra,* 480 U.S. at 289 n. 19, 107 S.Ct. 1123. Clearly, the employer could not deny her the employment because of her handicap

without violating the Human Rights Act. *Id.* We are persuaded that, in determining whether the employer failed to make reasonable accommodation for Strass' condition, the jury could consider properly evidence that there was a vacant position available which Strass was qualified to fill. The position, according to Strass' evidence, was less demanding. Instead, the company hired for the position someone who, according to the evidence, had difficulties in two other management positions with the company. Considered with the other evidence of how Strass' termination came about, the jury could have concluded that the employer could have, but declined to, accommodate her condition. Kaiser argues that it sought to accommodate Strass in other ways, but that she insisted on only two accommodations. Considering all the evidence and the reasonable inferences therefrom, the jury was at liberty to reject Kaiser's version of the events.

Strass also requested as an accommodation that Kaiser restore the staff removed from her department. Kaiser argues that employers are not required to assign employees or hire new employees to perform an employee's duties in order to accommodate that individual's condition. While job restructuring, under certain circumstances, may be a reasonable accommodation, an employer is not required to reallocate essential functions of a particular position. *Johnston, supra,* 849 F.Supp. at 779.[8] The employer is not required to hire staff to perform the essential functions of the job which the employee cannot perform. *Id.* at 779–80; *accord, Reigel v. Kaiser Found. Health Plan,* 859 F.Supp. 963, 973 (E.D.N.C.1994). An employer is not required "to make fundamental or substantial modifications in its operations to assure every disabled individual the benefit of employment." *Id.* (citations omit-

ted). Moreover, an employer is not required to place a stress-sensitive employee in a virtually stress-free environment. *Pesterfield v. Tennessee Valley Auth.,* 941 F.2d 437, 442 (6th Cir.1991).

However, this case is different than *Johnston, Reigel,* and *Pesterfield.* Here, there was evidence that Strass could perform her functions before her staff was removed. She did not request additional staff to perform her job; she requested to return to the status quo before she experienced the conditions which brought on the hypertension. The vacancies needed to be filled in order that she could perform her job, and the new staff, presumably, could perform the jobs previously performed by former staff. There was evidence that the company deferred filling the vacancies until after Strass' termination. As Strass summarizes her argument, the jury could have determined from the evidence that the company learned of her disability, attempted to force her to quit by failing to fill the positions on her staff essential to the performance of the job, denied her alternative employment for which she was qualified, and then filled the staff positions for her replacement shortly after she left Kaiser. While an employer is not required to hire employees to perform the functions of the job that a handicapped individual cannot perform, the employer cannot deliberately create conditions which render it impossible for a handicapped person to discharge the responsibilities of the position for the purpose of forcing the handicapped person to quit. That is essentially Strass' claim in this case.[9] Although Kaiser offered evidence to counter Strass' evidence as outlined, the jury could have rejected it in favor of Strass' version of the facts. Viewing the evidence in the light most favorable to Strass, it cannot be said

---

8. In determining the kind of proof required to prove Human Rights Act violations, this court has looked to cases decided under analogous federal statutes for guidance. *American Univ., supra,* 598 A.2d at 422.

9. Strass also claimed discrimination based upon disparate treatment. The trial court did not consider this issue separately in ruling on the motion for judgment as a matter of law. In light of our disposition, we need not address it here.

that no reasonable juror could find in her favor on the Human Rights Act claim.

Kaiser makes two additional arguments which require only brief discussion. Kaiser argues that no reasonable juror could find that Strass had a physical handicap within the meaning of the Human Rights Act. It contends first that Strass did not prove that she had a perceived or actual disablement and that her condition did not meet the definition of a handicapped person under federal law in that it did not substantially limit one of her major life's functions.[10] Our dissenting colleague also takes this position. Instead of applying the definition of handicap which was in effect at the time Strass' claim arose, D.C. Human Rights Act, D.C.Code § 1–2502(23)[11] and regulations then in effect, 4 DCMR § 599.1 (1995),[12] they rely principally on the more restrictive requirements of the subsequently amended local statute which redefined the protected class using the term "disability," instead of "handicapped."[13] Although the term disability in the amended version of the Human Rights Act is defined in language identical to the federal definition appearing in the Americans with Disabilities Act, 42 U.S.C. § 12102(2) and federal regulations, the new law and the federal case law interpreting this language, cited in the dissenting opinion, are not controlling in resolving this case which arose under prior law.

■ Moreover, this issue is not properly before this court. Kaiser did not proceed to trial on the theory that the definition of disability under the subsequent enactment controlled.[14] It did not raise this issue in its motion for judgment as a matter of law, and the trial court did not consider it.[15] Rather, in its motion, Kaiser relied specifically upon the definition prior to the amendment of the Human Rights Act, i.e., D.C.Code § 1–2502(23).[16] Then, it argued only that Strass did not meet the definitional requirements of § 1–2502(23) factually because: (1) her condition was controlled by medication and her pressure was low at

10. Under federal regulations, a handicapped person was defined at the time Strass' cause of action arose, as one who:

 (1) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) has a record of such impairment, or (3) is regarded as having such an impairment.

 29 C.F.R. § 1613.702(a)(repealed 1992). The definition is the same under the ADA, 42 U.S.C. § 12102(2) and current regulations under the Rehabilitation Act. *See* 29 C.F.R. § 1614.203(a) (1999).

11. The term "handicap" was then defined in the Human Rights Act as "a bodily or mental disablement which may be the result of an injury, illness or congenital conditions which does not preclude the capacity to perform a particular job and for which reasonable accommodation can be made."

12. For the applicable text of this section, see note 17, *infra*.

13. The term "disability" is defined in the amended Human Rights Act as

 a physical or mental impairment that substantially limits one or more of the major life activities of an individual having a rec-

ord of such an impairment or being regarded as having such an impairment.
 D.C.Code § 1–2502(5A) (1999).

14. The trial court instructed the jury consistent with the definition in the prior statute.

15. Indeed, Kaiser again asserts in its brief that the law enacted after Strass' claim arose is not controlling. In arguing for rejection of a right in the employee for reassignment in some circumstances under 42 U.S.C. § 12111(9)(B), it argues that the provision is not applicable because it became effective after Strass' discharge. Kaiser acknowledges that while the court may look for guidance in ADA cases which are consistent with the relevant law, "the Court should not afford Strass a substantive reassignment right that no law afforded during the time she was employed."

16. Kaiser did not challenge by cross-appeal the correctness of the trial court's instruction based on the definition of the law in effect at the time the claim arose. Thus, the trial court's determination in that regard would not be properly before us. *See Bible Way Church v. Beards*, 680 A.2d 419, 431 (D.C. 1996), *cert. denied*, 520 U.S. 1155, 117 S.Ct. 1335, 137 L.Ed.2d 494 (1997); *Griffith v. Butler*, 571 A.2d 1161, 1163 n. 3 (D.C.1990).

one point; and (2) there was no showing that reasonable accommodation could be made for her condition. "[I]t is not appropriate at this juncture to inject a different defense theory which was not presented at trial." *Vector Realty Group v. 711 14th St.,* 659 A.2d 230, 233 (D.C.1994) (citing *Easter Seal Soc'y for Disabled Children v. Berry,* 627 A.2d 482, 488–89 (D.C.1993)). There are some differences between federal law and the Human Rights Act and the regulations governing it which define more broadly those covered under the Act.[17]

Under the provisions of the Human Rights Act in effect at the time her claim arose, it is sufficient that Strass showed that she had a physical disability and that Kaiser discriminated against her in her employment, in whole or in part, because of it. Although Kaiser points to other evidence from which the jury could have found that it had non-discriminatory reasons for discharging Strass, there was evidence from which the jury could have determined that the reasons either did not exist or were pretextual. The jury apparently did that, and there is no basis for disturbing its findings.[18]

## C. Contract Claim

Strass argues that the trial court erred in setting aside the jury's verdict on her breach of contract claim. Strass' theory of recovery was that Kaiser breached its implied contract by terminating her without following the progressive discipline policies outlined in Kaiser's Personnel Policy Manual (Manual), and the jury found in her favor on that claim.[19] In granting Kaiser's post-trial motion for judgment as a matter of law, the trial court concluded that "the evidence presented at trial was insufficient to allow a reasonable jury to conclude that

---

17. The District of Columbia Employment Guidelines for Human Rights Law, 4 DCMR § 599.1 provides the following definition for physical handicap, in pertinent part:

> [A] bodily or mental disablement which may be the result of injury, illness or congenital condition which does not preclude the capacity to perform a particular job and for which reasonable accommodation can be made. Physical or mental disablement means any physiological disorder or condition .... The term physical or mental disabilities includes, but is not limited to, such diseases and conditions as ... heart disease, diabetes, mental retardation, and emotional illness.

18. In any event, we are satisfied that there was ample evidence from which the jury could find, as the jury did, that Strass' condition, although controlled by medication, was a disability within the meaning of the Act. *See Harris v. H & W Contracting Co.,* 102 F.3d 516, 522 (11th Cir.1996) (disease capable of substantially limiting major life activities if left untreated qualifies as a handicap); *see also Oswalt v. Sara Lee Corp.,* 74 F.3d 91, 92 (5th Cir.1996) (recognizing that evidence that high blood pressure substantially limits a major life activity may bring it within the ADA). *Compare Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (upholding dismissal of complaint for disability discrimination under the ADA where glasses or contact lenses corrected the petitioners' vision to function identically with individuals without a similar impairment), *with Murphy v. United Parcel Serv.,* 527 U.S. 516, 119 S.Ct. 2133, 2137, 144 L.Ed.2d 484 (1999) (citing *Sutton* and upholding affirmance of summary judgment based upon determination of no disability in that petitioner's condition in a medicated state does not substantially limit a major life activity under the ADA).

19. The trial court instructed the jury with respect to the breach of contract claim:

> One of the issues that you'll have to consider in determining whether the policy manual was a contract is the effect of the disclaimer of that manual. While in its express disclaimer that the manual is not a contract, it [is] evidence that the employer did not intend to be bound by it, other provisions of the manual and the employer's actions may contradict and demonstrate that there was a contract, notwithstanding the disclaimer.
>
> Thus, the employer's manual or its other written policies, statement or its instructions to its employees may show that the employer really had contracted with its employees to follow the provisions of the manual. But unless the plaintiff has established by a preponderance of all the evidence that Kaiser clearly planned to abandon the disclaimer and enter into a new agreement with the plaintiff, your verdict on the plaintiff's contract claim must be for Kaiser.

there was an express or implied agreement between Kaiser and its employees which superseded the disclaimer in the Manual, or that there were any special circumstances or inducements suggesting that plaintiff had a contract different from that of the other Kaiser employees." Strass argues here, as she did in the trial court, that Kaiser's disclaimers in the Manual do not automatically relieve it of its obligation to follow the progressive discipline policies set forth in the Manual before terminating her employment. She contends that the evidence was sufficient to allow the jury to conclude that Kaiser had that contractual obligation. Kaiser contends that the Manual's contractual disclaimer was unambiguous and that there was no evidence of any agreement which would supersede it. We review first the legal principles governing our resolution of the parties' respective positions and then consider their application to the facts presented at trial.

 There is a well-settled presumption in this jurisdiction that "a hiring not accompanied by an expression of a specific term of duration creates an employment relationship terminable at will by either party at any time." *Nickens v. Labor Agency of Metro. Washington,* 600 A.2d 813, 816 (D.C.1991) (citations omitted). However, this presumption can be rebutted by evidence that the parties intended that termination be subject to specific preconditions. *Id.* (citing *Washington Welfare Ass'n, Inc. v. Wheeler,* 496 A.2d 613, 616 (D.C.1985)). The terms of an employer's personnel or policy manual may be sufficient to raise a jury question as to whether the manual creates contractual rights for the employee. *Wheeler,* 496 A.2d at 615; *Nickens,* 600 A.2d at 817. In *Wheeler,* the letter of employment specified no period of employment; however, the employer's Personnel Policy and Procedures Manual distinguished between the procedures for discharge of permanent and probationary employees. 496 A.2d at 615. In *Wheeler,* it was determined that since these terms in the Manual evidenced

the parties' intent that certain preconditions be met before the employment could be terminated, the contract was distinguishable from an employment-at-will contract. *Id.* at 616. Thus, the trial court's decision permitting the case to go to the jury and denying the employer's motion for judgment notwithstanding the verdict was upheld. *Id.* Similarly, in *Nickens,* the employee contended that the employer's personnel policies manual established preconditions to termination which the employer breached. 600 A.2d at 817. There, the policies manual required that each staff member receive a copy and "accept 'the position and the Personnel Policies governing his/her employment' in writing," after which the agency head would sign the employee action form. *Id.* We said that these factors provided evidence that the parties intended the manual to establish contractual rights, or at the very least, raised a factual question for resolution by the factfinder. *Id.*

 The decisions in *Wheeler* and *Nickens* show that contractual rights may arise from language in employee manuals. However, employers can effectively disclaim any implied contractual obligation arising from such provisions. *Smith v. Union Labor Life Ins. Co.,* 620 A.2d 265, 269 (D.C.1993) (citing *Goos v. National Ass'n of Realtors,* 715 F.Supp. 2, 4 (D.D.C. 1989)). "The legal effect of such a disclaimer is, in the first instance, a question for the court to decide." *Id.* In *Smith,* a disclaimer in the personnel handbook stated that "it is not an employment contract and does not guarantee any fixed terms and conditions of employment.... Employment for management personnel is for no definite period, is terminable at will and is subject to satisfactory performance." 620 A.2d at 269 n. 1. This language, absent facts or circumstances indicating a superseding agreement or unconscionability, was found sufficient for the court to conclude as a matter of law that the management employee was an employee at-will

**1012**

who could be discharged with or without cause. *Id.* at 269.

■ Not in every case will a contractual disclaimer clause be adequate to relieve an employer of obligations specified in its regulations. *See Greene v. Howard Univ.,* 134 U.S.App.D.C. 81, 88, 412 F.2d 1128, 1135 (1969).[20] In *Greene,* provisions in the university's Faculty Handbook made clear that a faculty member who was not finally informed by April 15 that his contract would not be renewed, had reason to believe that he could rely on returning to the university the following semester, 134 U.S.App.D.C. at 86–87, 412 F.2d at 1133–34. The university argued that it had no contractual obligation to give such notice because qualifying language in the employee's handbook relieved the university of any obligation to observe its regulations to that effect. Included in the handbook was a section reading, "without contractual obligation to do so" in connection with its purpose to give employees notice by certain fixed dates. 134 U.S.App.D.C. at 87, 412 F.2d at 1134. The D.C. Circuit rejected the argument that other provisions of the handbook were negated automatically by the disclaimer and held the disclaimer to be in conflict with a rational interpretation of the bargain between the parties. 134 U.S.App.D.C. at 88, 412 F.2d at 1135. Against these legal principles, we consider whether the disclaimers in Kaiser's Policy Manual and Handbook entitle Kaiser to judgment as a matter of law, or whether construed in light of other provisions in the documents, a jury triable question is created as to Kaiser's obligations to its employees before termination.

Kaiser relies upon disclaimers in the Manual and the Employee Handbook to support its argument that there was no contractual requirement that Kaiser comply with progressive discipline procedures before terminating Strass. The introduction in the Manual states that it is not a contract, reading in relevant part as follows:

> This Personnel Policy Manual is designed to provide each employee with a clear set of guidelines for situations which develop in the workplace. This manual is not a contract, but rather a statement of the intention of the Kaiser–Georgetown Community Health Plan, Inc., in matters covered by the policies contained herein.

Similarly, the Employee Handbook states that "[t]he contents of the [Manual] are presented as a matter of information only and are not to be understood or construed as a promise or contract between the Company and its employees." However, as Strass argues, other provisions of the Manual contradict these disclaimers. While Kaiser's Policy Manual states at the outset that it is not a contract, it declares in the very same sentence that it is "a statement of the intention of Kaiser ... in matters covered by the policies contained [in the document]." Some evidence that the policy's terms are mandatory also appears on the next page of the document, which provides:

> Where there are conflicts with existing union contracts, the contracts shall be controlling. However, where union contracts are silent, the Personnel Policy Manual *shall* be controlling. (Emphasis added.).

Strass argues that the Manual affirmatively imposes reciprocal duties upon non-probationary employees. Further, she contends there was evidence that Kaiser's practices were to conform to the progressive discipline procedure. Section 8.03 of Kaiser's Personnel Policy Manual covers "progressive discipline".[21] This procedure

**20.** The opinion in *Greene* is binding precedent under *M.A.P. v. Ryan,* 285 A.2d 310 (D.C. 1971).

**21.** The relevant portion of Section 8.03 reads as follows:

> The disciplinary procedure which follows is intended as a guide for supervisors and employees to follow for most problems which arise in the workplace. However, severe infractions or problems such as

includes the following steps: (a) informal counseling; (b) formal counseling; (c) written warning; (d) final warning, suspension; (e) discharge; and (f) immediate dismissal for severe infractions. It also provides for documentation of disciplinary action and for representation of the employees during disciplinary meetings.

The section on progressive discipline contains language which tends to support that Kaiser intended, and the employee could reasonably expect, that application of this policy was required before termination. The Manual provides, for example, that "[i]nformal counseling will occur when the supervisor recognizes unsatisfactory work performance"; that "[f]ormal counseling will occur after a repeated infraction"; "[t]he final warning will be administered as the fourth step"; and that "[e]xcept in cases of gross misconduct or gross negligence, a discharge will be preceded by a final warning." This section of the Manual is preceded by Kaiser's statement that it is their "policy to adhere to an established protocol to ensure fair and consistent treatment of employees in handling of disciplinary action."

 Other provisions of the policy also support Strass' position that it was intended by Kaiser to govern the rights and responsibilities of Kaiser and its employees. These provisions are also covered by the mandatory term, "shall," rather than the permissive, "may." The Manual contains provisions governing leave, wages, salary, benefits, health and safety, employee services, grievance procedures, and other conditions of employment. An examination of these sections reveal that they specify obligations for both the employer and employee. The Manual designates, for example, specific holidays for which employees will be paid, providing that "when a holiday falls on Sunday, the following Monday *shall* be a paid holiday." (Policy Manual, Section 3.01). It provides

for a "floating holiday" for which compensation "*'shall'* be equal to the employee's regularly scheduled work day," up to eight hours. (Policy Manual, Section 3.02). In instances of non-compliance with the provisions set forth in the Manual, the employee is subject to forfeiture of certain benefits. For example, under Section 8.04, unless non-probationary employees comply with the notice requirements for termination set forth in the policy, that employee "shall not be entitled to payment of ... accrued [vacation] leave." It is difficult to comprehend how the non-contractual qualifier in the beginning of the Manual can be viewed reasonably to abrogate what clearly appear to be obligations of the employer and employee of this type. By adopting written policies for consistent application to the terms of employment,

> "the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee."

*Sisco v. GSA Nat'l Capital Fed. Credit Union*, 689 A.2d 52, 57 (D.C.1997) (quoting *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W.2d 880, 892 (1980)).

 "This court has held that a personnel manual that states specific preconditions that must be met before employment will be terminated is sufficiently clear to rebut the presumption of at-will employment." *Rinck v. Association of Reserve City Bankers*, 676 A.2d 12, 16 (D.C. 1996) (citing *Wheeler, supra*, 496 A.2d at 616 ). While there is language in Kaiser's policy manual that it is not a contract, this qualifier is rationally at odds with other language in the document. Construing the document as a whole, a jury could conclude reasonably that the employer intended to

gross misconduct or gross neglect of duty may warrant by-passing any or all of the

early steps in the procedure.

be bound by its terms, including those related to its progressive discipline policy. *See Greene, supra,* 134 U.S.App.D.C. at 88, 412 F.2d at 1135. The progressive discipline policies in this case established preconditions to termination, and are similar to those provisions which can rebut the presumption of at-will employment. *See Sisco, supra,* 689 A.2d at 57; *see also Rinck,* 676 A.2d at 16 (citation omitted). We recognize that *Sisco* allows that an employer, by disclaimer, may negate the reasonableness of the employee's expectation that the employer will be bound. 689 A.2d at 57. However, that does not answer the question whether the disclaimer in this case, considered with reference to the entire document, effectively relieved Kaiser of any and all obligations which the policies set forth. *See Greene,* 134 U.S.App.D.C. at 87, 412 F.2d at 1134. A jury question was raised as to this issue. Therefore, the trial court's initial determination to submit the issue to the jury was correct, and the decision to set aside the jury's verdict on the claim, erroneous.[22]

For the foregoing reasons, the grant of judgment as a matter of law for Kaiser is reversed, and the case is remanded with instructions for the trial court to consider first Kaiser's alternate request that the jury's award of damages be reduced.[23] If denied, then, the jury verdict shall be reinstated.

*Reversed and remanded.*

SCHWELB, Associate Judge, dissenting.

Unlike my colleagues in the majority, I find myself in substantial agreement with the written opinion of the trial judge, Honorable Patricia A. Wynn, in which she set aside the verdict in Ms. Strass' favor and held that Kaiser was entitled to judgment as a matter of law.[1] For some of the reasons stated by Judge Wynn, and for the additional reasons set forth below, I respectfully dissent.

## I.

## BREACH OF CONTRACT

I begin, as did the trial judge, with a consideration of Ms. Strass' claim for breach of contract. Ms. Strass asserts that Kaiser's Personnel Policy Manual imposed a contractual obligation on Kaiser to follow the progressive discipline policies described therein. Although a policy manual may, under some circumstances, constitute a contract, an effective disclaimer will defeat any inference that a contractual obligation is being undertaken. *See, e.g., Smith v. Union Labor Life Ins. Co.,* 620 A.2d 265, 269 (D.C.1993). In this case, the trial judge held as a matter of law that Kaiser's express disavowals of any intention to enter into a binding contract were fatal to Ms. Strass' breach of contract claim. See appendix at pp. 1022–25. I find the judge's reasoning persuasive, and add the following observations of my own.

Kaiser made it clear in the very first paragraph of its Personnel Policy Manual that "[t]his manual *is not a contract."* (Emphasis added.) In addition, Kaiser's Employee Handbook, of which Ms. Strass acknowledged receiving a copy, states that

22. The trial court had previously denied Kaiser's motion for summary judgment presenting essentially the same theory. In light of our disposition of this issue, we need not decide whether the motions judge's prior ruling denying summary judgment for Kaiser on this question precluded the trial court from considering the issue because of "law of the case" rules, which generally preclude a court from reconsidering the same question of law previously decided by a court of coordinate jurisdiction. *See Williams v. Mount Jezreel Baptist Church,* 589 A.2d 901, 907 (D.C.1991).

We also need not consider whether the trial court erred in denying admission of evidence of orders and training that Strass received from Kaiser showing its requirements that the policies in the Manual be followed.

23. Kaiser did not designate its request as one for remittitur, but that appears to be its nature. Therefore, we remand to the trial court for consideration of the issue.

1. I attach Judge Wynn's order as an appendix to this opinion.

the contents of the Manual "are presented as a matter of information only and *are not to be understood or construed as a promise or contract* between the Company and its employees." (Emphasis added.) Kaiser could hardly have stated more clearly its intention *not* to be legally required to adhere to the procedures described in the Manual and *not* to give up its freedom of action. Nevertheless, my colleagues in the majority hold that Kaiser was contractually obligated to Ms. Strass.

"In order to form a binding agreement, both parties must have the distinct intention to be bound; without such intent, there can be no assent and therefore no contract." *Edmund J. Flynn Co. v. La-Vay*, 431 A.2d 543, 547 (D.C.1981). Accordingly, in determining whether the parties have entered into a contract, the question whether the parties intended to be bound must be "closely" examined. *See Jack Baker Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1239 (D.C.1995) (citing *LaVay* ). A "close" examination of the Personnel Manual and Employee Handbook reveals that Kaiser did not intend to be contractually bound and took the trouble to say so, prominently and forcefully. In my opinion, Ms. Strass is effectively asking the court to write a new and binding contract for parties who never entered into one. This we are not empowered to do. *See, e.g., Waters v. Kopp*, 34 App. D.C. 575, 582 (1910).

Moreover, an employment relationship, such as the one between Kaiser and Ms. Strass, is subject to well-established legal principles. A contract of employment is presumed to be terminable at-will, and this presumption may be successfully rebutted only where the parties have "stated clearly their intention to limit the employer's right to terminate." *Perkins v. District Gov't Employees Fed. Credit Union*, 653 A.2d 842 (D.C.1995) (quoting *Littell v. Evening Star Newspaper Co.*, 73 App.D.C. 409, 410, 120 F.2d 36, 37 (1941)). "[W]here no such intent is clearly expressed . . . the assumption will be that . . . the parties have in mind merely the ordinary business contract for a continuing employment, terminable at the will of either party." *Littell, supra*, 73 App.D.C. at 410, 120 F.2d at 38.

My colleagues point to the use of words such as "shall" elsewhere in the Manual. They suggest that such terminology is mandatory in nature and renders the Manual ambiguous, in spite of Kaiser's disclaimers. I cannot agree that use of these words can convert a non-binding statement of policy into an enforceable contract. In my opinion, the document as a whole leaves no doubt as to its meaning, which can be summarized as follows: "This is the way we ordinarily do things, but we are not contractually bound to do them in that way." In sum, Kaiser did not intend to enter into a contract, it unequivocally stated that intention, and the court cannot make and enforce a contract to which the parties never agreed. But even if there were some doubt as to the meaning and effect of Kaiser's disclaimers—and I discern none—it cannot fairly be said that the parties in this case have *clearly* entered into a binding contract modifying Ms. Strass' status as an at-will employee, *see Perkins, supra*, 653 A.2d at 842, when the documents which, according to Ms. Strass, constitute that contract, explicitly state that there is no contract and that the Manual is not to be understood or construed as an enforceable obligation or even as a promise.

My colleagues rely heavily on *Greene v. Howard Univ.*, 134 U.S.App. D.C. 81, 412 F.2d 1128 (1969). See maj. op., *ante*, at 1011–12. In that case, non-tenured instructors at Howard University who had allegedly participated in on-campus disturbances claimed that, without notice to the instructors, the University had refused to renew their appointments, and that this refusal was in violation of the University's obligations as set forth in the Faculty Handbook. Section IX of the Handbook provided that "[i]t will be the practice of the University, without contractual obligation to do so," to give advance written

notice at specified times during the academic year to instructors who would not be retained for the following academic year. In a university setting, the necessity for such notice is apparent, for faculty members need to know in advance whether they will be retained, so that they may make timely application elsewhere in case of non-retention. The notification dates specified in the Faculty Handbook having passed, the instructors had been led to believe that their contracts would be routinely renewed. After the on-campus disturbances, however, the instructors were peremptorily notified, without opportunity for a hearing, that they would not be retained on the Howard faculty.

Reversing the trial court's decision in favor of the University, the Court of Appeals held that

> the contractual relationships existing here, when viewed against the regulations prescribed for, and the practices customarily followed in, their administration, required the University *in the special circumstances here involved* to afford the teachers an opportunity to be heard.

*Greene,* 134 U.S.App.D.C. at 84, 412 F.2d at 1131 (emphasis added). The court did not decide the substantive issue, namely, whether, notwithstanding its disclaimer of a contractual obligation, the University was obliged to retain the instructors where the notice contemplated in the Handbook had not been timely given.

The key words in the above-quoted passage from *Greene* are those that I have italicized—"in the special circumstances here involved." The court obviously wrote in this limitation deliberately, and the reader was thus forewarned that the court was not fashioning a broad rule embracing cases in which such special circumstances did not exist. The *Greene* case arose in

the rather esoteric world of academe, with its own traditions and expectations, and the court's entire opinion reflects this critical fact. The court explicitly stated:

> Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is. *The readings of the market place are not invariably apt in this noncommercial context.*

134 U.S.App.D.C. at 88, 412 F.2d at 1135 (emphasis added).

Because "the readings of the market place" were not implicated in *Greene,* the court made no mention at all of the principles that would have governed the controversy if the instructors had been discharged by a commercial enterprise such as Kaiser. The opinion in *Greene* contains no discussion, for example, of the presumption that an employment contract is at-will, nor did the court advert to the rule that an intention to rebut that presumption must be stated clearly and unequivocally.[2] The court thus did not decide or even explicitly address the legal issue that controls the present appeal or the case law that informs that issue.

Given the fundamental principle that there can be no contract where the parties have not clearly agreed to be contractually bound, one might quarrel with the decision in *Greene* even in the academic context in which that case arose.[3] But be that as it may, I discern no special or other circumstances in the present case which would permit the court to create and enforce a contract into which Kaiser never agreed to enter, nor should we hold that the Manual and Handbook reflect a "clear" intent to depart from the at-will doctrine when those documents forcefully proclaim the

---

**2.** The court in *Greene* did not cite its own earlier decision in *Littell,* nor did it discuss the legal principles set forth in that case.

**3.** *Greene* is, however, binding on us under *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971), and the question whether that case was correctly decided on its facts is therefore academic.

exact opposite.[4] If this court treats the description in a manual of an employer's procedures as a binding and enforceable contract even in the face of strong disclaimers such as Kaiser's, the foreseeable effect of such a holding will be to discourage employers from providing manuals to their employees and from reducing their ordinary (but non-mandatory) procedures to writing. Such a consequence will benefit neither employers nor employees.

## II.

### DISABILITY

In 1992, when Kaiser fired Ms. Strass, the District's Human Rights Act made it unlawful, *inter alia,* to discharge an employee "wholly or partially for a discriminatory reason based upon ... physical handicap." D.C.Code § 1–2512(a)(1) (1992). At that time, "physical handicap" was defined as "a bodily or mental disablement which may be the result of injury, illness or congenital condition for which reasonable accommodation can be made." D.C.Code § 1–2512(23) (repealed). The present appeal is governed by the definition of physical handicap then in effect.

In 1994, the Council passed the Human Rights Act of 1977 Disability Definition Amendment Act (DDAA). *See* Act No.

10–228, 41 D.C.Reg. 2583–84 (May 13, 1994).[5] In the new statute, the Council deleted all references to "physical handicap" and substituted therefor the term "disability." The 1994 Act contained the following definition of that term:

"Disability" means a physical or mental impairment that substantially limits one or more of the major life activities of an individual having a record of such an impairment or being regarded as having such an impairment.

D.C.Code § 1–2502(5A) (1999). The definition of "disability" in § 1–2502 is identical to the "federal" definition that appears in the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102(2) and in regulations adopted by the Equal Employment Opportunity Commission (EEOC) under the federal Rehabilitation Act of 1973. *See* 29 C.F.R. § 1614.203(a) (1999).

Ms. Strass seems to argue, and the majority appears to assume, that although the relevant provisions of the Human Rights Act are now identical to those of the ADA, the protections provided by District law in 1992 were broader than those available under federal law. This is incorrect. Indeed, any suggestion that the 1994 modernization of statutory terminology effected a significant change in substantive law is quite inaccurate.[6] On the contrary, the

4. Although my analysis makes it unnecessary to reach the point, I note that the court in *Greene* also relied on the University's consistent adherence to the provisions of the University's Handbook, which adopted the "Standard for Notice of Non–Reappointment" adopted by the American Association of University Professors (AAUP). 134 U.S.App.D.C. at 86–87 & n. 7, 412 F.2d at 1133–34 & n. 7. In this case, on the other hand, the trial judge concluded that "[t]here was no evidence which would support a finding that the [progressive discipline] procedures were rigidly applied to all employees as a matter of right."

5. Nothing in this opinion suggests that the DDAA applies retroactively to this case. *Cf.* maj. op. at 1009–10 & nn. 16 & 17. Rather, my point is that the coverage provided by District of Columbia law and regulations in 1992 was identical to, and no broader than, the reach of the Human Rights Act today.

6. Ms. Strass' argument that coverage under the Human Rights Act, before its amendment in 1994, was broader than federal coverage under the federal ADA assumes that in 1994, when the Council adopted the federal terminology, it intended to cut back on the coverage of the Act. If, as Ms. Strass insists, the pre–1994 statute was broader than the ADA, then it was also broader than the current District statute, which is identical in relevant respects to the ADA. Under Ms. Strass' theory, the Council must have enacted the 1994 amendment in order to *reduce* the protections provided to disabled citizens of the District.

There is not a shred of evidence to support any claim that the 1994 revision weakened the District's Human Rights Act. No such intention to place new limits on the Act's coverage is disclosed or even suggested by the legislative history. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SERVICES AND YOUTH AFFAIRS, Report on Bill 10–298, Human

federal standard for determining disability had been a part of District of Columbia law since 1986, when the Office of Human Rights and the Commission on Human Rights promulgated "Physical Handicap Guidelines." These Guidelines stated, *inter alia:*

> Except as otherwise provided in this chapter, the Office and the Commission adopt and incorporate by reference the provisions promulgated by the United States Equal Employment Opportunity Commission, which appear in 29 C.F.R. § 1613.701 *et seq.*[7]

4 DCMR § 513.1; 33 D.C.Reg. 4546, 4553 (Aug. 1, 1986).

The EEOC regulations, which the District's human rights agencies adopted and "incorporated by reference" into the Physical Handicap Guidelines, contained, almost verbatim, the definition of "disability," quoted above, which now appears in the ADA.[8] The legal standard that was in

effect in the District at the time of Ms. Strass' discharge was thus identical, for all practical purposes, to the present legal standard. Under the law in effect in 1992, as under current law, a plaintiff claiming protection under the Human Rights Act was required to demonstrate that she was "substantially limit[ed]" in her major life "activities," or that she was regarded as being so limited. 29 C.F.R. § 1615.103(1).

The EEOC has defined "major life activities" as

> functions such as caring for one's self [sic], performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

29 C.F.R. § 1615.103(2). Kaiser contends that Ms. Strass did not show that she was disabled under the foregoing standard, and that no impartial jury could reasonably find that she was so disabled. I agree.

At trial, and now on appeal, Ms. Strass has taken the position that her high blood

---

Rights Amendment Act of 1993 (January 12, 1994). (This Report also embraces the DDAA.) The Report, which is quite brief, makes no mention of substantive changes in the reach of the law. Rather, the Council was apparently seeking to adopt the more up-to-date (some might say politically correct) terminology utilized in the federal statute.

If, as Ms. Strass' position assumes, the DDAA had been designed to weaken the Human Rights Act's protections for disabled people, such an intent would surely have precipitated some debate among the members of the Council. Chairman Lightfoot's Report reveals, however, that "there [was] no need to have an additional hearing on Bill 10–298 because of the overwhelming support for this bill at the December 2, 1992 hearing."

7. 29 C.F.R. § 1613.701 is now 29 C.F.R. § 1615.103.

8. The Employment Guidelines further defined "Physical Handicap" as follows:

> A bodily or mental disablement which may be the result of injury, illness or congenital condition which does not preclude the capacity to perform a particular job and for which reasonable accommodation can be made. Physical or mental disablement means any physiological disorder or condition, cosmetic disfigurement, or anatomical

> loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, cardiovascular, reproductive, digestive, genito-urinary, hemic, and lymphatic, skin, and endocrine; or any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term physical or mental disabilities includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, acquired immune deficiency syndrome, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, and emotional illness.

33 D.C.Reg. at 4560.

I do not believe that this definition can fairly be viewed as meaning that the provision of the Physical Handicap Guidelines incorporating the EEOC regulations does not apply. The definition includes a disorder of the skin, but this obviously does not mean that every summer rash is a physical handicap entitling the employee to statutory protection. The affirmative adoption in the Physical Handicap Guidelines of the EEOC regulations provides a means of distinguishing a trivial ailment, which does not trigger protection, from a significant one which substantially limits a major life activity and places the employee within the protected class.

pressure, or hypertension, constitutes a "physical handicap" as that term was used in the Human Rights Act prior to 1994, and is also a "disability" under current law. But as the Supreme Court has recently noted, "[s]ome 50 million Americans have high blood pressure." *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2149, 144 L.Ed.2d 450 (1999). In enacting the ADA, Congress found that "some 43,000,000 Americans have one or more physical or mental disabilities...." 42 U.S.C. § 12101(a)(1); *Sutton, supra,* 119 S.Ct. at 2147. Many people suffer from disabilities unrelated to high blood pressure—blindness, deafness, and paraplegia, to name a few—and Congress obviously intended to provide protection to persons so afflicted. Since the number of people suffering from hypertension (approximately fifty million) exceeded the number that the ADA was enacted to protect (approximately forty-three million), Congress could not have considered hypertension, without more, to be a disability warranting protection under the Act. Thus, even before the Supreme Court's decision in *Sutton,* in which the Court gave the term "disability" a substantially narrower construction than it had previously been accorded by the EEOC and by eight of nine federal appellate courts, *see Sutton,* 119 S.Ct. at 2153 (Stevens, J., dissenting), the federal authorities uniformly supported Kaiser's position that "blood pressure alone, without any evidence that it substantially affects one or more major life activities, is insufficient to bring an employee within the protection of the ADA." *Oswalt v. Sara Lee Corp.,* 74 F.3d 91, 92 (5th Cir.1996) (per curiam) (quoting and *aff'g* 889 F.Supp. 253, 258 (N.D.Miss. 1995)); *accord, Aucutt v. Six Flags Over Mid–Amer., Inc.,* 85 F.3d 1311, 1318–20 (8th Cir.1996); *Murphy v. United Parcel Serv.,* 946 F.Supp. 872, 875 (D.Kan.1996), *aff'd mem.,* 141 F.3d 1185 (10th Cir.1998),

*aff'd,* 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999).

Viewed in the light most favorable to Ms. Strass, the record in this case does not support a finding that her high blood pressure substantially limited Ms. Strass in a "major life activity." There was no evidence that she could not perform manual tasks, or walk, or see, or hear, or speak, or breathe, 29 C.F.R. § 1615.103(2). Ms. Strass likewise does not contend that she is unable to work, *see id.;* on the contrary, she has worked as a consultant since her discharge, and she has earned almost as much as she did at Kaiser. Moreover, according to Ms. Strass, she could even have done her old job if she had been provided with sufficient staff. Ms. Strass also asserts that she could have successfully handled the newly-created position of Director of Community Relations—a job for which her superiors at Kaiser believed her to be unsuited.

There was, of course, evidence that Ms. Strass was unable to perform her former duties with a reduced staff, and that it was the stress caused by her attempts to do that job that precipitated her hypertension. But "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Aucutt, supra,* 85 F.3d at 1319 (citing 29 C.F.R. § 1630.2(j)(3)(i)). As Ms. Strass points out in her reply brief, her own medical expert testified that Ms. Strass' hypertension would have resolved if the "unusual and extraordinary stress" to which she was exposed at work beginning in late 1991 had been eliminated. It is difficult to reconcile this testimony with any claim that Ms. Strass was substantially limited in the life activity of working.

There was evidence that, from time to time, Ms. Strass' hypertension caused severe headaches and neck pain, fatigue, and insomnia.[9] Standing alone, however, such

9. Ms. Strass asserts that these symptoms might have been more frequent if she had not taken medication for them. She also claims that "[her] hypertension, left unmitigated, ex-

posed her to the risk of life-threatening heart attack and stroke." In presenting these contentions, Ms. Strass relies on authorities holding that the determination whether an em-

symptoms constitute a disability within the meaning of the ADA only if the employee's major life activities are significantly affected. *See, e.g., Hodgens v. General Dynamics Corp.,* 963 F.Supp. 102, 107–08 (D.R.I. 1997); *cf. Grant v. The May Dep't Stores, Inc.,* 127 Daily Wash. L. Rptr. 1709, 1711 (Super.Ct.D.C.1999) (Walton, J.) (applying "major life activity" standard under District's Human Rights Act).

Finally, Ms. Strass contends that even if she was not in fact suffering from a disability, Kaiser regarded her as suffering from one. In this respect, however, the present case is indistinguishable from the Supreme Court's recent decision in *Murphy, supra,* which also involved an employee who was suffering from hypertension, who had been discharged from a particular job, but who was able to do other work:

> [I]n light of petitioner's skills and the array of jobs available to petitioner utilizing those skills, petitioner has failed to show that he is regarded as unable to perform a class of jobs. Rather, the undisputed record evidence demonstrates that petitioner is, at most, regarded as unable to perform only a particular job. This is insufficient, as a matter of law, to prove that petitioner is regarded as substantially limited in the major life activity of working. *See Sutton,* 119 S.Ct. at 2151–52.

119 S.Ct. at 2139.[10]

## III.

## REASONABLE ACCOMMODATION

Because, in my view, Ms. Strass was not suffering from a "bodily disablement," I do not believe that the court needs to reach the question whether the accommodations sought by Ms. Strass were reasonable. On the merits of that issue, however, I agree entirely with Judge Wynn. In my opinion, "the only duty owed to a currently employed handicapped employee ... is to reasonably accommodate that individual within the position that [s]he presently holds." *Guillot v. Garrett,* 970 F.2d 1320, 1326 (4th Cir.1992) (construing Section 501 of the Rehabilitation Act, 29 U.S.C. § 791).[11] Judge Murnaghan put it concisely in *Carter v. Tisch,* 822 F.2d 465, 467 (4th Cir.1987):

> There can be no doubt that Kaiser preserved the substantive issue. Kaiser's memorandum in support of its oral motion for judgment as a matter of law stated, *inter alia,* that "a hypertensive employee who claimed to suffer severe headaches and an upset stomach has been held to be not handicapped *absent evidence that his high blood pressure substantially interfered with one of his major life activities.*" (Emphasis added; citations omitted.)

ployee suffers from a disability should be made without reference to available medication or other corrective measures. *See, e.g., Harris v. H & W Contracting Co.,* 102 F.3d 516, 522 (11th Cir.1996), and the EEOC Guidelines, 29 C.F.R. § 1630.2(h). These authorities, however, are no longer viable in light of the Supreme Court's supervening decision in *Sutton,* in which the Court disapproved the EEOC regulations on this issue and adopted what had been the minority view among the federal appellate courts, namely, that mitigating measures must be considered.

10. Kaiser failed to request a jury instruction to the effect that Ms. Strass' disabilities must substantially limit a major life function. On the basis of that failure, my colleagues assert, maj. op. at 1009 n. 16, that the point was thereby waived. I cannot agree. To be sure, a party who fails at trial to request an instruction ordinarily will not be heard to assert on appeal that such an instruction should have been given. *See* Super. Ct. Civ. R. 51. Kaiser is not asserting instructional error, however. Rather, Kaiser is arguing that the evidence of disability was insufficient to support the verdict in Ms. Strass' favor.

11. The court noted in *Guillot,* however, that as a matter of federal administrative practice independent of the duty to make a reasonable accommodation, "an employer may not forbid an employee who is unqualified for the position he holds from availing himself of other employment opportunities (*i.e.,* transfer or reassignment) that are available under the employer's existing policies." *Id.* at 1327 (internal quotation marks omitted). I would hold, by imperfect analogy, that a disabled employee of a private business must be accorded the same right as her non-disabled counterpart to transfer to another position within the organization.

The case law is clear that, if a handicapped employee cannot do his job, he can be fired, and the employer is not required to assign him to alternative employment.

Finally, Kaiser's ability to afford to hire more employees, and thus to reduce Ms. Strass' stress level, is irrelevant. As the trial judge correctly observed, Kaiser was "not required to alter general decisions about personnel needs or revise program or budgetary priorities in order to accommodate [Ms. Strass' alleged] disablement ." (Citation omitted.)

## IV.

## CONCLUSION

For the foregoing reasons, I respectfully dissent.

## APPENDIX

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA CIVIL DIVISION

### STEPHANIE A. STRASS, Plaintiff

v.

### KAISER FOUNDATION HEALTH PLAN OF THE MID–ATLANTIC STATES, INC., Defendant

Civil Action: 92cal4841
Judge Wynn
Calendar 10

### *ORDER*

This matter comes before the Court on defendant's motion for remittitur and supplemental motion for judgment as a matter of law or, in the alternative, for a new trial, plaintiff's oppositions thereto, and defendant's reply. After considering all of the pleadings and the record in this case, this Court finds that defendant's motion for judgment as a matter of law pursuant to Super. Ct. Civ. R. 50 should be granted.

## BACKGROUND

This case arises from an employment relationship between plaintiff Stephanie Strass and defendant Kaiser Foundation Health Plan of the Mid–Atlantic States, Inc. (Kaiser). Ms. Strass was employed as Kaiser's Director of Public Affairs between April 14, 1988 and February 18, 1992. In the fall of 1991, Ms. Strass informed her supervisors at Kaiser of her belief that she suffered from hypertension. On February 18, 1992, Ms. Strass was fired, and on November 18, 1992, Ms. Strass filed a complaint against Kaiser alleging breach of an employment contract, violation of the District of Columbia Human Rights Act, and infliction of emotional distress. Subsequently, Ms. Strass amended her complaint and withdrew the infliction of emotional distress claim. Kaiser filed a motion seeking summary judgment as to the two remaining counts on January 14, 1994, which this Court denied on March 8, 1994.

A jury trial commenced on September 19, 1994, and at the close of defendant's case on September 26, 1994, defendant renewed its motion for a directed verdict. The Court reserved ruling on the motion and on September 28, 1994, a jury verdict was returned in favor of plaintiff in the amount of five hundred twenty-five thousand forty-seven ($525,047.00) dollars. The Court now has before it defendant's motion for remittitur and supplemental motion for judgment as a matter of law or, in the alternative, for a new trial, plaintiff's oppositions thereto, and defendant's reply.

## JUDGMENT NOTWITHSTANDING THE VERDICT

Super. Ct. Civ. R. 50 provides that "[w]henever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the Court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." SUPER. CT. CIV. R. 50(b). Therefore, when deciding a motion

for judgment notwithstanding the verdict, the court shall apply the same standards as applied to a motion for directed verdict. *Faniel v. Chesapeake & Potomac Telephone Co.*, 404 A.2d 147, 150 (D.C.1979); *District of Columbia v. Cassidy*, 465 A.2d 395, 397 (D.C.1983). Consequently, the Court must construe the evidence and all legitimate and reasonable inferences therefrom in the light most favorable to the non-moving party. *Clement v. People's Drug Store, Inc.*, 634 A.2d 425, 427 (D.C.1993); *Cassidy*, 465 A.2d at 397; *Gabrou v. May Dep't Stores*, 462 A.2d 1102, 1104 (D.C.1983); *Washington Welfare Ass'n Inc. v. Poindexter*, 479 A.2d 313, 315 (D.C.1984); *Faniel*, 404 A.2d at 150. Once the court has construed the evidence in such a manner, the moving party is entitled to a judgment notwithstanding the verdict only if the evidence shows that no reasonable jury could have found for the nonmoving party. *Washington Welfare Ass'n Inc.*, 479 A.2d at 315; *Gabrou*, 462 A.2d at 1104; *Faniel*, 404 A.2d at 150; *Cassidy*, 465 A.2d at 397. *See Stokes v. Children's Hosp. Inc.*, 805 F.Supp. 79, 81 (D.C. Cir.1992) (stating that judgment notwithstanding the verdict should be granted when the evidence is so one-sided against the non-moving party that the moving party must prevail).[1] Applying the above-stated principles, this Court finds that defendant's motion for judgment as a matter of law should be granted on both the breach of contract claim and the District of Columbia Human Rights Act claim.

## BREACH OF CONTRACT

Plaintiff claims that defendant breached an implied contract by terminating her without applying the progressive discipline policies outlined in Kaiser's Personnel Policy Manual (the Manual). Plaintiff admits that there was no express employment contract between her and Kaiser, but claims that Kaiser's conduct of rigidly applying the progressive discipline policies created an implied contract which converted her employment status from that of an at-will employee, to that of an employee who could be discharged only if certain preconditions were met. Kaiser moves this Court to enter judgment as a matter of law on the breach of contract claim, arguing that the evidence at trial was insufficient to allow a reasonable jury to conclude that an implied employment contract existed between plaintiff and Kaiser. Defendant denies the existence of an express or implied contract, relying on the disclaimers in the Manual and the Kaiser Permanente Employee Handbook (the Employee Handbook), both of which clearly state that the policies and procedures set out in the Manual do not constitute a contract.

The District of Columbia Court of Appeals has consistently held that in this jurisdiction there is "a presumption that a hiring not accompanied by an expression of a specific term of duration creates an employment relationship terminable at will by either party at any time." *Nickens v. Labor Agency of Metro. Washington*, 600 A.2d 813, 816 (D.C.1991) (citations omitted). This presumption can be rebutted by evidence that the parties intended that employment be subject to specific preconditions before termination. *Id.* The parties must, however, clearly state their intention to alter an at-will employment agreement. *Littell v. Evening Star Newspaper Co.*, 73 App.D.C. 409, 410, 120 F.2d 36, 37 (1941); *Perkins v. District Gov't Employees Fed. Credit Union*, 653 A.2d 842, 843 (D.C.1995). Provisions in personnel policy manuals can, under certain circumstances, provide sufficiently clear evidence of the parties' intent as to the terms of an employment contract. *See, e.g., Washington Welfare Ass'n, Inc. v. Wheeler*, 496 A.2d 613, 615 (D.C.1985). But

---

1. Because Super. Ct. Civ. R. 50 is identical to Fed.R.Civ.P. 50, federal court decisions may be used as persuasive authority in interpret-ing Super. Ct. Civ. R. 50. *Street v. Hedgepath*, 607 A.2d 1238, 1243 n. 5 (D.C.1992).

employers also can effectively disclaim any implied contracts arising from such manuals, as Kaiser did in the instant case. *Smith v. Union Labor Life Ins. Co.*, 620 A.2d 265, 269 (D.C.1993).

Both the Manual and the Employee Handbook have express disclaimers stating that the provisions of the Manual are not intended to create any contractual rights. The disclaimer in the Manual reads as follows:

> This Personnel Policy Manual is designed to provide each employee with a clear set of guidelines for situations which develop in the workplace. This manual is not a contract, but rather a statement of the intention of the Kaiser–Georgetown Community Health Plan, Inc. in matters covered by the policies contained herein.

Personnel Policy Manual, Introduction, Plaintiff's Ex. 32. Similarly, the Employee Handbook states:

> The contents of [the Personnel Policy Manual] are presented as a matter of information only and are not to be understood or construed as a promise or contract between the Company and its employees.

Kaiser Permanente Handbook at 6, Defendant's Ex. 3. In the absence of evidence that the disclaimer was unconscionable or that the parties had entered into some separate agreement, this Court must conclude as a matter of law that plaintiff was an employee-at-will. *Smith*, 620 A.2d at 269 (given no facts or circumstances indicating that the disclaimer was unconscionable or that the employer and employee had entered into some kind of agreement that superseded the disclaimer in the handbook, employee was a management employee at-will who could be discharged with or without cause).

Plaintiff makes no claim of unconscionability, but contends that she presented sufficient evidence for a reasonable jury to conclude that there was a separate agreement which superseded the disclaimers in the Manual and the Employee Handbook. Plaintiff does not claim that there was a separate agreement which was specific to her. *Compare, Rinck v. Ass'n of Reserve City Bankers*, 676 A.2d 12 (D.C. 1996). Instead plaintiff claims that Kaiser's rigid application of the progressive discipline procedures and the various memoranda and training concerning those procedures were both evidence of Kaiser's intent to bind itself to provide these procedural protections as a matter of right to all of its employees.

The Court finds plaintiff's underlying premise to be highly questionable. Ms. Strass claims that Kaiser's conduct of setting out the progressive discipline procedures and then rigidly applying these procedures superseded its express disclaimer that the Manual did not create contractual rights. If the language establishing the procedures cannot be evidence of an implied contract in the face of express disclaimers, see *Smith*, 620 A.2d at 269, citing *Alameda v. Martin Marietta Corp.*, 6 IER cases 95, 97, 1990 WL 236125 (D.D.C.1990), then it is hard to understand how the application of those same procedures, no matter how rigidly enforced, can be evidence of a separate implied contract. Similarly, the development of training materials and internal personnel memoranda in an attempt to uniformly apply the disciplinary procedures cannot create a contractual right which supersedes the express disclaimers. As Kaiser stated in its manual, the manual is simply "a statement of the intention of [Kaiser] in matters covered by the policies contained [in the manual]." Conduct consistent with that statement of intention cannot convert the Manual's provisions into a separate superseding agreement.

Even if the Court were to accept plaintiff's theoretical premise, plaintiff failed to present evidence that would allow a reasonable jury to find that the progressive discipline procedures were in fact rigidly and uniformly applied. Plaintiff relies

heavily on internal personnel memoranda and training materials addressing the progressive discipline procedures which were provided to the managers and supervisors. The existence of such training materials, however, is not evidence that the procedures were actually strictly enforced. Indeed, introductory language in the Phillips Memorandum, plaintiff's Ex. 34, written in December of 1991, just before plaintiff was fired, indicates that an unevenness existed in the level of understanding among supervisors with regard to the various aspects of formal discipline. Further, the training memoranda themselves repeatedly emphasize that they are guidelines only, and suggest that there are various exceptions to the stated policies. The memoranda adopt a goal of consistency but also recognize that a flexible approach is necessary and the progressive discipline procedures must be applied on a case-by-case basis. Plaintiff also cites her personal training as a supervisor and advice she received in addressing particular personnel matters. But her limited personal experiences do not support a logical inference that all terminations were preceded by progressive discipline. At the most, plaintiff's evidence proves only that Kaiser attempted to act consistently with the intentions stated in the Manual. There is no evidence which would support a finding that those procedures were rigidly applied to all employees as a matter of right.

Plaintiff appears to present an alternative theory, that the training and personnel memos were themselves evidence of an intent by Kaiser to modify the employment agreement. The unilateral adoption of a policy does not in and of itself create a binding agreement. By the same token, the development of internal personnel memoranda and training to carry out a policy of the employer does not create contractual rights in the absence of a clear statement of the intent to do so. *Shankle v. DRG Fin. Corp.*, 729 F.Supp. 122, 124 (D.D.C.1989) (citation omitted) (the presumption of terminable-at-will employment can be rebutted only by a clear statement of the parties' intention to do so.) The language in the Manual and the Employee Handbook clearly states that the procedures outlined are not a contract and nothing in the language of the training memoranda suggests an intent to supersede that disclaimer and create contractual rights. As described above, the memoranda state that they are being provided as guidelines on the implementation of progressive discipline. Furthermore, the language of the memoranda referring to case-by-case application suggests various exceptions without precisely defining such exceptions, an approach which is inconsistent with an intent to create contractual rights with such a document. Finally, the language of the memoranda suggests a completely different business purpose, namely, to provide procedures which will protect the company from potential lawsuits.[2] *Cf. Shankle,* 729 F.Supp. at 125 (termination procedures outlined in the manual are not designed to confer any procedural rights on the company's employees, but rather to provide direction to supervisors and protect defendant from unwarranted claims).

A third theory alluded to by plaintiff is that as a result of her training as a supervisor and the advice she received with regard to applying the progressive discipline procedures to her staff, plaintiff justifiably believed that these procedures were contractual rights. Even if this training and advice created a subjective belief in plaintiff that these procedures were contractual rights for all employees, including herself, such a belief is insufficient to support a finding that Kaiser agreed that plaintiff's "at-will" employment was con-

---

**2.** In the cover memo attached to various articles on progressive discipline circulated to the managers, Mr. Charles Phillips, the Director of Labor Relations and Compensation, stated that the purpose of the Human Resources Department was to help supervisors to "make appropriate decisions regarding the imposition of discipline that can withstand grievances and/or lawsuits." Plaintiff's Ex. 34.

verted to a "just cause" employment contract. *See Shankle,* 729 F.Supp. at 125. The fact that plaintiff's belief was based on Kaiser's conduct is not probative of Kaiser's intent. Kaiser's intent must be gleaned from its conduct and statements alone, without regard to plaintiff's subjective understanding of such conduct. As stated above, Kaiser's conduct does not reasonably support a finding that Kaiser clearly intended to supersede the published disclaimers and modify its contract with its employees.

Thus the Court finds that the evidence presented at trial was insufficient to allow a reasonable jury to conclude that there was an express or implied agreement between Kaiser and its employees which superseded the disclaimer in the Manual, or that there were any special circumstances or inducements suggesting that plaintiff had a contract different from that of the other Kaiser employees. No reasonable jury could conclude that the internal personnel memoranda and training regarding the implementation of Kaiser's progressive discipline policy created contractual rights in the absence of a clear statement of the parties' intent to do so. Nor was there evidence that Kaiser rigidly enforced the progressive discipline procedures or that its conduct in applying these procedures in any way created an agreement with its employees which superseded the disclaimers. Therefore, defendant's motion for judgment as a matter of law must be granted on the breach of contract claim.

## DISTRICT OF COLUMBIA HUMAN RIGHTS ACT

Defendant also moves this Court to enter judgment as a matter of law on the District of Columbia Human Rights Act violation claim. Defendant argues that plaintiff failed to establish a prima facie case of discrimination because her hypertension did not meet the Act's definition of a "handicap." On this point, Kaiser states that because plaintiff's hypertension was controlled by medication, and, further, because there was no evidence that a reasonable accommodation could have been made for her condition, she did not qualify as a handicapped individual. Alternatively, Kaiser argues that even if plaintiff proved that she suffered from a physical handicap as defined by the Human Rights Act, no reasonable jury could find that Kaiser failed to provide plaintiff with a reasonable accommodation or that plaintiff was discharged because of her alleged handicap. In support of the verdict reached by the jury, plaintiff argues that her hypertension was a physical handicap within the meaning of the Human Rights Act and that Kaiser could have, but failed to accommodate her hypertension, and terminated her instead.

A physical handicap, as defined by the District of Columbia Human Rights Act, is "a bodily or mental disablement which may be the result of injury, illness or congenital condition for which reasonable accommodation can be made." D.C.Code § 1–2502(23). Thus, in order to come within the protection of the Human Rights Act, plaintiff must first prove that she suffers from a physical handicap for which reasonable accommodation can be made. *American University v. Com'n on Human Rights,* 598 A.2d 416, 422 (D.C.1991). In particular plaintiff is required to show that:

(a) except for [her] physical handicap, [she] is qualified to fill the position; (b) [she] has a handicap that prevents [her] from meeting the physical criteria for employment; and (c) the challenged physical standards have a disproportionate impact on persons having the same handicap from which [she] suffers. To sustain this prima facia case there should also be a facial showing or at least plausible reasons to believe that the handicap can be accommodated or that the physical criteria are not "job related."

*Id.* quoting *Prewitt v. United States Postal Serv.,* 662 F.2d 292, 309–10 (5th Cir.1981).

Applying this legal standard to the present case, the Court finds that defendant's motion for judgment as a matter of law should be granted as there was no reasonable accommodation that Kaiser could have provided that would have enabled plaintiff to perform the essential functions of her job.[3]

At trial and in her post-trial pleadings, plaintiff argues that her hypertension was caused by job-related stress and Kaiser could have accommodated her handicap by reducing stress in her job in either of two ways: 1) by filling vacant positions in the public relations staff; or 2) or by offering her a newly created "Community Affairs" position. Plaintiff cites no authority to support her position that these proposals are "reasonable accommodations." Defendant argues that case law has given definition to the term "reasonable" as used in the Act, and that neither of these proposed accommodations fall[s] within that definition.

As set out above, the Court of Appeals in *American University* stated that "the statutory definition [of a handicap] requires more than a showing that one has a mental [or bodily disablement]. To come within the Act's protection, a complainant must first prove that he or she has a mental disablement for which reasonable accommodation can be made." *American University*, 598 A.2d at 422 (citations omitted). Reversing the Commission on Human Rights, the Court held that although the record supported the Commission's

finding that the complainant suffered from a mental disablement, there was no evidence showing that the deficiencies in her job performance were related to that disablement, or that reasonable accommodation for her disablement was possible.

As a first step in proving that a handicap can be reasonably accommodated, the employee must prove that the condition is susceptible to some accommodation which the employer could provide. *Id.* at 423. Like the disablement in *American University*, the claimed handicap in this case is one for which the causes and effects and the methods of controlling or accommodating the disablement are not readily apparent. And like the plaintiff in *American University*, Ms. Strass has offered no expert evidence that her hypertension would have been controlled by either of the accommodations she proposes. Although there was expert testimony to support plaintiff's claim that it was job-related stress which caused or at least contributed to her hypertension, there was none to support her claim that either .of the proposed accommodations would have relieved the hypertension. Indeed, there was uncontroverted evidence that plaintiff had performed this same job for over two years without suffering from hypertension and further that her hypertension continued up to the time of the trial, even though she had left her position at Kaiser over two years earlier. The Court therefore agrees with defendant that plaintiff's claims that her condition could have been

---

**3.** Defendant argues on three separate grounds that plaintiff's evidence was insufficient for a reasonable jury to conclude that her condition was a "handicap" as defined by the District of Columbia Human Rights Act: 1) that plaintiff's hypertension was controlled by medication and therefore it was not a "disablement"; 2) that there was no evidence that the hypertension was caused by job stress, and, therefore, there was no basis for finding that the hypertension could be accommodated by anything the employer might do; and 3) that, given the nature of the job, there was no "reasonable accommodation" which would relieve the hypertension. Plain-

tiff presented evidence through her own testimony, as well as the testimony of Dr. Pak, Dr. Maron, and her husband, which would arguably rebut the first two of defendant's arguments. In addition, Kaiser argues that at least part of plaintiff's human rights claim is barred by the statute of limitations. Because the Court finds that plaintiff's evidence cannot support a finding that her condition could be reasonably accommodated, the Court does not address defendant's other arguments or its alternative argument that even if plaintiff established a prima facie case, there was insufficient evidence that Kaiser's conduct was discriminatory.

accommodated by Kaiser are speculative. *See, Carrozza v. Howard County, Md.,* 847 F.Supp. 365 (D.Md.1994) (plaintiff's conclusory observations that certain accommodations would enable her to perform the job do not meet the criterion of *factual* evidence), *aff'd per curiam,* 45 F.3d 425 (4th Cir.1995).

Assuming for the sake of argument that the proposed accommodations would have been effective, plaintiff must also show that such accommodations were reasonable. Courts have consistently held that the accommodations required of employers for the purpose of relieving employee stress are limited. Employers have no duty to change the nature of an employee's job in order to accommodate that employee's disablement. *Johnston v. Morrison, Inc.,* 849 F.Supp. 777 (N.D.Ala.1994).[4] Although reasonable accommodation may include "job restructuring" or the implementation of a part-time work schedule, an employer is not required to reallocate essential functions of the job. *Id.* (citations omitted); *Carrozza v. Howard County, Md., supra.* An employer may be required to have someone assist the disabled individual to perform the job. *See, e.g., Carter v. Bennett,* 840 F.2d 63 (D.C.Cir.1988) (the employer provided readers to assist a blind employee). The employer is not required, however, to have someone perform the job for the disabled individual. *Johnston,* 849 F.Supp. at 779 (citations omitted). Nor must employers provide a stress free environment in order to accommodate a "stress-sensitive" employee. *Pesterfield v. Tennessee Valley Authority,* 941 F.2d 437, 442 (6th Cir.1991); *Johnston,* 849 F.Supp. at 777. Finally, an employer is required to accommodate only the employee's present position. The employer is not required to find another job for the disabled employee. *Guillot v. Gar-*

*rett,* 970 F.2d 1320 (4th Cir.1992); *Carter v. Tisch,* 822 F.2d 465, 467–8 (4th Cir. 1987); *Florence v. Frank,* 774 F.Supp. 1054 (N.D.Tex.1991);

Although reasonableness of accommodation is a question of fact which is usually to be decided by a jury, here undisputed facts lead to the conclusion that the proposed accommodations are unreasonable. *See, Carrozza v. Howard County, Md.,* 45 F.3d 425 (4th Cir.1995) (affirming trial court's grant of summary judgment based on plaintiff's failure to proffer sufficient evidence that her handicap could have been reasonably accommodated) (opinion attached). Stress was inherent in plaintiff's position as Director of Public Affairs. Indeed, in a job description prepared by plaintiff, planning and implementing "crisis communication efforts" is listed as one of the major job functions. Plaintiff's Ex. 10. Coping with the inherent stressors of the position of Director of Public Affairs is, arguably, one of the fundamental requirements of the job. Hiring additional staff in order to reduce the stress on the manager of a busy and demanding department goes well beyond the "restructuring" of a position. Plaintiff argues fervently that Kaiser had ample funds to hire additional people, citing its profit in 1991 and the money expended on a major board meeting which plaintiff characterizes as "nonfunctional," "supremely wasteful," and "overblown." All of this is completely irrelevant. An employer is not required to alter general decisions about personnel needs or revise program and budgetary priorities in order to accommodate an employee's disablement. *Florence v. Frank,* 774 F.Supp. at 1061. Nor is an employer required to " 'restructure' a job as to change its fundamental requirements, such as the ability to cope with its inherent stressors." *Carrozza v. Howard County, Md.,* 847 F.Supp. at 368 (citations omitted). Plaintiff's proposed accommodation is clearly not within

4. The claim in *Johnston* is brought under the federal Americans With Disabilities Act. In determining the kind of proof required in claims for discrimination based on handicap, the Court of Appeals has looked to cases under the analogous federal statute for guidance. *American University,* 598 A.2d at 422 (citations omitted).

the definition of a reasonable accommodation.[5]

Plaintiff's second proposed accommodation, that she be given a new position, is also unreasonable as a matter of law. Although there is mention of reassignment in some of the regulations adopted for the implementation of the federal Rehabilitation Act, the case law is clear that such reassignment is not within the definition of a reasonable accommodation. *Guillot v. Garrett, supra; Carter v. Tisch,* 822 F.2d at 467–8; *Florence v. Frank, supra.* Plaintiff cites no authority to the contrary.

Thus, the Court finds that the evidence presented at trial was insufficient to allow a reasonable jury to conclude that Ms. Strass was a handicapped individual and that by terminating her Kaiser discriminated against plaintiff in violation of the District of Columbia Human Rights Act. Since plaintiff did not present evidence that a reasonable accommodation that would have enabled her to perform the essential functions of her job was possible, plaintiff was not a handicapped individual within the meaning of the District of Columbia Human Rights Act. Defendant's motion for judgment as a matter of law must therefore be granted on the District of Columbia Human Rights Act violation claim.

**THEREFORE**, it is this 28th day of June, 1996,

**ORDERED** that the judgment for plaintiff entered September 28, 1994, be and hereby is **VACATED**, and it is further

**ORDERED** that defendant's motion for judgment as a matter of law as to the breach of contract claim be **GRANTED**, and it is further

**ORDERED** that defendant's motion for judgment as a matter of law as to the District of Columbia Human Rights Act violation claim be **GRANTED**, and it is further

**ORDERED** that the remaining pending motions—Defendant's Motion for Remittitur, Plaintiff's Motion for Status Conference, and Plaintiff's Motion for Prompt Decision of Defendant's Post–Trial Motions—be **DENIED AS MOOT**.

s/ Patricia Wynn
PATRICIA WYNN
JUDGE

---

**5.** Indeed, even the accommodation which Kaiser provided, allowing plaintiff to take time off whenever she wanted to, was not an accommodation which could have been required of the defendant. *Johnston,* 849 F.Supp. at 779 (in interpreting the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.,* courts have found that an employee's inability to work necessary hours justifies an employee's termination).